## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TEH SHOU KAO and T S KAO, INC.,** on behalf of themselves and all others similarly situated, | |
| **Plaintiffs,** | **CIVIL ACTION NO. _____** |
| **v.** | **COMPLAINT – CLASS ACTION** |
| **CARDCONNECT CORP.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

Plaintiffs Teh Shou Kao and T S Kao, Inc., on behalf of themselves and the class of persons and entities preliminarily defined below, file this Class Action Complaint against Defendant CardConnect Corp. ("CardConnect" or "Defendant") pursuant to Federal Rule of Civil Procedure 23 and Local Rule 23.1.

## NATURE OF THE CASE

1.    This is a civil action seeking monetary damages and restitution from Defendant arising from its improper business practices in connection with the provision of merchant services relating to payments via credit and debit cards ("merchant services" or "payment processing services").

2.    In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards.  In order to accept this method of payment, the merchant must utilize merchant services.

3.    Merchants rely on the companies that provide merchant services to do so at a fair price and in accordance with fair and appropriate terms.  Fees for merchant services are likely the third highest expense most merchants incur, following labor and product costs.

4.     Merchant services are provided through a system involving many parties.  For instance, in addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction is likely to involve (a) the bank that issued the credit or debit card to the customer (e.g., Chase or Bank of America); (b) the card association through which the transaction is processed (e.g., Visa, MasterCard, Discover, or American Express); (c) the card association member bank (e.g., Wells Fargo, Synovus); (d) the company that actually processes the payment (e.g., First Data); (e) the company that sells or leases the payment processing equipment to the merchant (although the merchant is certainly allowed to own this equipment); (f) the merchant acquirer that provides merchant services (e.g., ensures payments are processed, handles monthly billing, and maintains the relationship with the merchant); and (g) the Independent Sales Organization ("ISO") that enrolls merchants in the merchant acquirer's services.   CardConnect is a merchant acquirer and is also an ISO. Additionally, CardConnect deals with over 1100 third party sales agents to enroll merchants in its services.

5.     The number of involved parties and moving pieces make it very difficult for small merchants to understand the process and/or how much it will cost.

6.     Such front-end explanation and clarity is critical because merchants typically sign long-term deals for merchant services that are either non-cancellable or cancellable only with hefty early termination penalties.  For example, CardConnect's early termination fee may be $750 or more.

7.     Unfortunately, some ISOs and payment processors take advantage of their position.   They induce "mom and pop" merchants to purchase merchant services without disclosing fees they know the merchant will be charged.   They also set up contractual

relationships that bind the merchant but not themselves and bury unconscionable and self-serving provisions in the middle of their fine print form contracts.

8.      ISOs engage in such tactics because they receive profits every month as long as they can keep customers from leaving to competitors.

9.      As an ISO, CardConnect is on the front line as the direct contact with merchants and the intermediary between merchants and the payment processor and member bank. CardConnect deals with First Data as its payment processor and Wells Fargo Bank, N.A. as its primary member bank.

10.     This case challenges CardConnect's business practices.     Specifically, CardConnect induces merchants to enter business relationships with it and its member bank by promising it will charge merchants low, agreed-upon rates and fees for payment processing services.   CardConnect then has merchants and a principal guarantor sign long-term, non-negotiable written contracts.

11.     The fine print terms that CardConnect intends to largely govern the contractual relationship are set forth in a separate document.   In this way merchants see and execute one document that prominently displays the agreed-upon rates and fees (the "Merchant Processing Application"), but are purportedly also bound by another document (the "Program Guide"). Through the separate, fine print Program Guide, CardConnect seeks to backtrack from the agreed-upon fees and rates that have actually been reviewed and approved by the merchants and immunize itself from liability if the merchant learns of CardConnect's overcharges.   Such provisions are illusory, lack mutuality, violate public policy, and are unconscionable.

12.     More fundamentally, however, neither CardConnect nor the member bank ever actually "accept" the contracts by signing them – an express condition precedent to their formation.   What results is a state of contractual limbo that gives CardConnect the discretion to

disregard agreed-upon rates and charges that it never formally "accepted," while at the same time purporting to hold merchants to fine print terms that are unfavorable to them.

13.     After merchants and their principal guarantors sign the contracts and the parties begin to do business, CardConnect raises rates and imposes new, unanticipated payment processing fees.  CardConnect is able to do so because it never "accepted" the contracts and is thus not limited to the fees and charges denoted therein.  These practices, of course, constitute unjust enrichment and it would be improper for CardConnect to retain such excessive, uncontemplated fees and charges.

14.     Alternatively, if CardConnect and the member bank could be deemed to have "accepted" the contract (such that it had been formed), the excessive fees and charges imposed violate such contracts.  Such fees are also violative of the covenant of good faith and fair dealing, which applies to such contracts under Pennsylvania law (which is made applicable by a term of CardConnect's form contract).

15.     Any argument by CardConnect that the excessive fees and charges are authorized by self-serving, adhesive contractual provisions referenced in paragraph 11, *supra*, are without merit because such terms are unenforceable.

**<u>PARTIES</u>**

16.     Plaintiff Teh Shou Kao ("Mr. Kao") is an individual and the principal owner of Plaintiff T S Kao, Inc.  The purported CardConnect contract personally obligates Mr. Kao, who was forced by CardConnect to sign as a guarantor for Plaintiff T S Kao.  Pursuant to numerous terms of Defendant's contract, Mr. Kao may be bound to pay substantial monies to CardConnect.

17.     Plaintiff T S Kao, Inc. is a Michigan corporation with its principal place of business at 1771 Washtenaw Road in Ypsilanti, Michigan, which is a Chinese food restaurant.

18.     Defendant CardConnect Corp. is the new name of FinTech Acquisition, Corp. ("FinTech").  FinTech was formed in 2013 and went public in 2015, raising $100 million to make acquisitions.  It was required to close on such an acquisition by August of 2016, or the company was to be dissolved.  In March 7, 2016, FinTech announced that it would acquire FTS Holding Corporation, the parent corporation for CardConnect LLC.  The price was about $350,000,000 in cash and stock.  The deal closed on August 1, 2016.  The combined companies are now included in CardConnect Corp., which is publicly traded on the NASDAQ Stock Market with ticker symbol "CCN."  Prior to the deal with FinTech, CardConnect grew rapidly through acquisitions, taking over nine other ISOs in the years leading up to its own sale.  CardConnect services more than 65,000 merchants and processes in excess of $21 billion in annual transactions.

## JURISDICTION AND VENUE

19.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest, fees, and costs, and some class members, including Plaintiffs, are citizens of states other than Pennsylvania.

20.     This Court has personal jurisdiction over Defendant because it conducts substantial business within the District.  Indeed, CardConnect's headquarters are located in King of Prussia, Pennsylvania.  As such, it has significant, continuous, and pervasive contacts in this District.

21.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant has its headquarters here and conducts substantial business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

22.     Venue and jurisdiction would also be proper in this Court pursuant to the purported terms of CardConnect's form contract, which states:

> **Venue.** We have substantial facilities in the State of Pennsylvania and many of the services provided under this Agreement are provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Pennsylvania.

## COMMON FACTUAL ALLEGATIONS

A.     <u>CardConnect Induces Merchants to Do Business with Promises of Low Cost Pricing.</u>

23.     CardConnect works with over 1,100 independent sales agents who sell CardConnect's services.  These agents are not CardConnect employees.  CardConnect also uses in-house sales people which are its employees.

24.     Even sales people that are not CardConnect employees, however, are allowed to use a CardConnect email address, switchboard for phone calls, fax number, etc.  These authorized agents are even encouraged to give themselves a title, such as "Sales Manager, CardConnect," even though they are not employed by the company.  They are allowed to pick their own titles, without regard for their actual position – sale agent – for CardConnect.  Once again, they also use CardConnect paperwork and contracts.  In all respects, customers are given the false impression that the sales agents are part of a large publicly-traded corporation.

25.     CardConnect has adopted form application paperwork which doubles as part of its contract with customers.  This Application includes contractual language which purports to bind merchants.  For example, it states "Client agrees to all the terms of this Merchant Services Application and Agreement."

26.     The contract also purports to integrate a much larger document, the CardConnect Program Guide.  Since it includes dozens of pages of small print legalese, it is understood that no merchant could ever read or understand the Program Guide.

27.     The Application also requires a person to "unconditionally and irrevocably guarantee the full payment and performance of" the merchant.

28.     The Application states that the deal "shall not take effect until Client has been approved and this Agreement has been accepted by CardConnect and Bank."  Bank is later defined to mean Wells Fargo Bank, N.A.  CardConnect may substitute Synovus Bank (USA) as "Bank" in some versions of the contract, since the CardConnect website states that the company is also an ISO for Synovus.

29.     The Application includes a section to be completed by CardConnect and the Bank.  For CardConnect it states: "Accepted By Financial Transaction Services, LLC dba CardConnect" and includes a signature line, blank to fill in the signer's title with the company, and a blank for the date.    For "Bank" it states: "Accepted By Wells Fargo Bank, N.A., 1200 Montego Way, Walnut Creek, CA 94598" and includes a signature line, blank to fill in the signer's title with Wells Fargo, and a blank for the date.

30.     Neither CardConnect, nor Wells Fargo, ever sign the Application.  As such, they have adopted a contracting system whereby they can always argue that merchants are bound by the terms of their contract, but they are never bound because no authorized officer of CardConnect or Wells Fargo has ever signed the contract.  Indeed, pursuant to the plain terms, the contract "shall not take effect until . . . accepted by CardConnect and Bank."

31.     Of course, merchants are not aware of this trick.  They believe they have a binding deal with CardConnect at the agreed-upon rates and fees prominently displayed in the Application.  Indeed, merchants are attracted to CardConnect because the contract includes rates and fees that will allow them to save money by reducing the costs they will pay for payment processing services if they switch providers.  This approach is very appealing to merchants because payment processing is a substantial business expense for them.

32.     The CardConnect Application does not indicate that (a) the agreed-upon fees and rates will increase (nor would increases be expected since technology and competition has actually driven down costs for payment processing) or (b) new, un-disclosed fees and rates will be charged.  Such terms unquestionably are important to merchants and would impact their decision to do business with CardConnect.

33.     Instead of conspicuously setting forth such critical provisions in the Application, CardConnect buries them in the fine print, non-negotiated Program Guide.  Multiple versions of the Program Guide have been in effect during the relevant period, but the material terms have been the same throughout.

B.      <u>CardConnect Buries Absurd Provisions in the Fine Print of the Program Guide that Purport to Allow It to Charge Whatever It Wants Without Fear of Legal Action.</u>

34.     The contract states that the merchant and personal guarantor obligate themselves to the terms set out in the Program Guide.  Given the dense legalese of the Program Guide, which is spread over 44 pages of text (depending on the version and format), there is zero chance of a merchant (or the personal guarantor) actually having read or understood it.

35.     The Program Guide is a boilerplate document that is not negotiable.  It states: "[w]e will not accept any alterations or strike-outs to the Agreement and, if made, any such alterations or strike-outs shall not apply."

36.     Several terms set forth in the Program Guide represent a unilateral effort by CardConnect to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize itself from liability for improper practices.

37.     The following terms may be relevant:

      a.     Section 4.8 (or equivalent in other versions of the contract) allows CardConnect to assess a monthly PCI noncompliance fee 90 days after the contract becomes effective, if the merchant fails to complete certain data security training measures;

b.      Section 19.5 (or equivalent in other versions of the contract) states: "Subject to Section 24.3, we may also increase our fees or add new fees for Services for any reason at any time, by notifying you thirty (30) days' [sic] prior to the effective date of any such change or addition." "Services" is defined in the glossary as: "The activities undertaken by Processor and/or Bank, as applicable, to authorize, process and settle all United States Dollar denominated Visa, MasterCard, Discover Network and American Express transactions undertaken by Cardholders at Client's location(s) in the United States, and all other activities necessary for Processor to perform the functions required by this Agreement for all other Cards covered by this Agreement."  Section 24.3 (or equivalent in other versions of the contract) provides: "In the event we provide notice to you of any new fees or increases in existing fees for Services, pursuant to Section 19.5, you may terminate this Agreement without further cause or penalty by notifying us that you are terminating this Agreement prior to the effective date of such new fees or increases.  However, maintaining your merchant account, or your continued use of the Services after the effective date of any such fee changes shall be deemed your acceptance of such fee changes for the Services, throughout the term of this Agreement."

c.      Section 21.4 (or equivalent in other versions of the contract) states: "OUR CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT), REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY, SHALL NOT EXCEED, (I) $50,000; OR (II) THE AMOUNT OF FEES RECEIVED BY US PURSUANT TO THIS AGREEMENT FOR SERVICES PERFORMED IN THE IMMEDIATELY PRECEDING 12 MONTHS, WHICHEVER IS LESS."

d.      Section 21.5 (or equivalent in other versions of the contract) states: "NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTION 24), OUR LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS TO YOU FOR ANY REASON, OTHER THAN FOR ANY REASON DESCRIBED IN SECTIONS 17.4 AND 17.6, WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT YOU SUBMIT THE TRANSACTION TO THE DATE THAT WE FUND THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS AS SET BY THE FEDERAL RESERVE BANK OF NEW YORK, NEW YORK, FROM TIME TO TIME, LESS ONE PERCENT (1%)."

e.      Section 22.3 (or equivalent in other versions of the contract) states: "You will treat this Agreement, the Card Organization Rules and any information supplied or otherwise made accessible by us or our agents as confidential, including without limitation, (i) information about the products, services, operations, procedures, customers, suppliers, sales,

pricing, business plans and marketing strategies of Servicers, their respective Affiliates and the customers, clients and suppliers of any of them; (ii) any scientific or technical information, design, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords Servicers a competitive advantage over its competitors; and (iii) all confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, databases, inventions, know-how, show-how and trade secrets, whether or not patentable or copyrightable and will not disclose the same to any third parties, provided, however, that these restrictions do not apply to information: (a) rightfully obtained on a non-confidential basis from a Person and your agents and representatives, which Person was not subject to a duty of confidentiality, (b) rightfully and independently known by you on a non-confidential basis prior to its disclosure or (c) generally available to the public other than through any disclosure by or fault of you, your agents or representatives."  Further, Section 22.3.4 (or equivalent in other versions of the contract) provides: "Client acknowledges that breach of the restrictions on use or disclosure of any our confidential information would result in immediate and irreparable harm to us, and money damages would be inadequate to compensate for that harm. We shall be entitled to equitable relief, in addition to all other available remedies, to redress any breach."

f.      Section 24.2 (or equivalent in other versions of the contract) states: "The initial term of this Agreement shall commence and shall continue in force for three years after it becomes effective.  Thereafter, it shall continue until we or you terminate this Agreement upon written notice to the other, or as otherwise authorized by this Agreement.  Should you fail to notify us in writing of your request to terminate you acknowledge and agree you will continue to be charged fees pursuant to this Agreement notwithstanding non- use of your account.  If you have an equipment lease, termination of this Agreement does not terminate that equipment lease."  Stunningly, a later portion of the contract purports to alter the length of the contract as follows: "Section 23.2 is replaced with the following: The initial term of this Agreement shall commence and shall continue in force for five years after it becomes effective.  Thereafter, it shall continue until either party terminates the Agreement upon written notice to the other."  Notably, the contract replaces the wrong section so the contract includes two portions, each imposing a markedly different contractual duration.

g.      Section 34.1 (or equivalent in other versions of the contract) provides that the law of CardConnect's home state applies: "**Choice of Law.** Our Agreement shall be governed by and construed in accordance with the laws of the State of Pennsylvania (without regard to its choice of law provisions)."  Further, Section 34.2 (or equivalent in other versions of the contract) states: "**Venue.** We have substantial facilities in the State of Pennsylvania and many of the services provided under this Agreement are

provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Pennsylvania."

h.   Section 34.3 (or equivalent in other versions of the contract) states: "**Waiver of Jury Trial.** ALL PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM RELATING TO OR ARISING UNDER THIS AGREEMENT."

i.   Section 35.3 (or equivalent in other versions of the contract) provides: "**Notices.** Except as otherwise specifically provided, all notices and other communications required or permitted hereunder (other than those involving normal operational matters relating to the processing of Card transactions) shall be in writing, if to you at your address appearing in the Application or by any electronic means, including but not limited to the e-mail address you have provided on the Application. If to us at our address appearing in Section A.6 of Part IV of this Agreement, with a copy to Attention: General Counsel's Office, 3975 N.W. 120th Avenue, Coral Springs, FL 33065, and Notices shall be deemed to have been given (i) if sent by mail or courier, upon the earlier of five (5) days after mailing or when actually received or, in the case of courier, when delivered, and (ii) if sent by facsimile machine, when the courier confirmation copy is actually received. Notice given in any other manner shall be effective when actually received. Notices sent to your last known address (including e-mail address), as indicated in our records, shall constitute effective notice to the Merchant under this Agreement." Notably the "General Counsel Office" address listed is for the legal department of First Data, the payment processor utilized by CardConnect, which is not even a party to the contract.

j.   Section 35.7 (or equivalent in other versions of the contract) provides: "**Amendment.** We may modify any provision of this Agreement by providing written notice to you. You may choose not to accept the requirements of any such change by terminating the Agreement within twenty (20) days of receiving notice. If you choose to do so, notify us that you are terminating for this reason so that we may waive any early termination fee that might otherwise apply. For purposes of this section, an electronic or 'click-wrap' notice intended to modify or amend this Agreement and which you check 'I Accept' or 'I Agree' or otherwise accept through an electronic process, shall constitute in writing as required herein. This Section 35.7 does not apply to fee changes, which are governed by Sections 19.4 and 19.5."

k.   Part IV entitled "ADDITIONAL IMPORTANT INFORMATION FOR CARDS" (or equivalent in other versions of the contract) provides: "In the event that Client terminates this Agreement within five (5) years from the date of approval by CardConnect and Wells Fargo Bank, N.A., Client will be charged a fee for such early termination of $750.00 per location (the

Early Termination Fee ("ETF")) and Client shall remain responsible for all unpaid fees and other obligations arising under this Agreement. Client's obligation with respect to the Monthly Minimum Processing Fee will end simultaneously with CardConnect's receipt of the Early Termination Fee and payment and satisfaction of all unpaid fees and obligations. Client's obligation with respect to the Monthly Minimum Processing Fee will end simultaneously with CardConnect's receipt of Termination Fee."

38.     If the CardConnect contract is binding – despite Defendant's and Wells Fargo's failure to complete a condition precedent, by signing the contract – then several of the provisions highlighted above and others violate public policy, lack mutuality, are unconscionable, and are otherwise void and unenforceable. *E.g.*, Program Guide, §§ 19.4, 19.10, 21.4, 21.5, 22.3, 24.2, 34.3, 35.7.

39.     More likely, since a binding agreement was never consummated given CardConnect and Wells Fargo's willful scheme to never sign the contract, the Court should apply principles of quasi-contract, determine that CardConnect's improper conduct has resulted in unjust enrichment, and order Defendant to reimburse its victims.

C.     CardConnect Raises Fees and Rates and Imposes New Categories of Fees Not Reflected in the Contract.

40.     After CardConnect starts providing merchant services, it charges fees and rates that are inconsistent with the fees and rates that are prominently set forth in the contract.

41.     Indeed, it increases agreed-upon rates and fees and also adds new categories of fees that were not referenced in the contract.

### INDIVIDUAL FACTUAL ALLEGATIONS

42.     On April 5, 2016, Mr. Kao and TS Kao, Inc. were approached by an authorized sales representative for CardConnect.

43.     CardConnect's agent asked to review the most recent statement from Plaintiffs' merchant services provider. Mr. Kao provided Mr. Histed with the requested statement, Mr.

Histed reviewed it, and he informed Mr. Kao he could save the restaurant over $200 per month in payment processing costs if the restaurant would switch to CardConnect.

44.     The agent presented Plaintiffs with a Merchant Processing Application which specifically identified the fees and rates they would be charged.  Based on the fees and rates shown on this document, Mr. Kao expressed interest in switching to CardConnect.

45.     By way of example, the Merchant Processing Application explained that Plaintiffs would be charged "cost-plus pricing."  Under this method of pricing, the interchange rates and the assessments set by the card networks are passed through to the merchant *at cost* and the merchant is separately charged an additional amount representing the payment processing fee (i.e., the interchange rates and assessments together comprise the "cost" in "cost-plus" pricing and the "plus" is CardConnect's fee).

46.     The Application reflects that Plaintiffs will pay the standard card network interchange rates and assessments plus a rate of 0.25% and $0.07 per transaction.

47.     By way of additional example, the Application disclosed that Plaintiffs would be charged specified recurring fees, including a $5.00 debit access fee, a $5.00 monthly statement fee, and a "Batch Fee" of $0.35 per occurrence.

48.     The agreed-upon payment processing rates and recurring fees found in the Application did not include recurring fees such as a "Pulse Fee" or a "Cardpointe Fee."

49.     The Application indicated that Plaintiffs would be charged a "PCI Non-compliance Fee" of $19.95 per month, but the Program Guide specified such fee would not be assessed for the first 90 days of the contract term and then only if Plaintiffs failed to complete certain data security training measures.

50.     Plaintiffs were satisfied with the terms, rates, and fees explicitly and prominently denoted on the Application and decided to do business with CardConnect.

51.     On April 5, 2016, Plaintiffs signed the Application.   A contract was never consummated, however, because neither CardConnect nor Wells Fargo (the member bank) ever accepted the contract by signing it.   *See* ¶¶ 29-31, *supra*.   Indeed, CardConnect recently forwarded Plaintiffs a copy of the Application that does not bear signatures of either CardConnect or Wells Fargo, even though the signatures are an express condition precedent of the contract.

52.     Even without a binding written contract, the parties began to do business.

53.     After the parties' relationship commenced, it soon became clear that the agreed upon pricing was not being followed.

54.     On the very first monthly statement, CardConnect informed Plaintiffs that it would soon be adding fees and charges to which Plaintiffs did not agree, including an annual "Pulse Fee" of $9.00.   This fee was not identified in the contract (despite the fact that it was purportedly implemented in 2013) and Plaintiffs never agreed to pay it.

55.     CardConnect also informed Plaintiffs that the $5.00 monthly statement fee set forth in the contract would immediately be renamed a "Cardpointe Fee" and would now be $15.00 per month.   Although the Cardpointe program had been effective since July 2014, it was not identified in the Application and Plaintiffs never agreed to pay for it.   Plaintiffs also never agreed to allow the $5.00 monthly statement fee they agreed to pay to be increased to $15.00.

56.     On May 31, 2016, less than two months into their relationship, CardConnect charged Plaintiffs a $19.95 monthly "PCI Non Comp Fee."   CardConnect did so despite the parties' agreement that such fee would not be charged for the first 90 days of the term of the contract.

57.     CardConnect direct-debited these and other unauthorized fees and charges from Plaintiffs' bank account.

58.     These are not the only unauthorized fees and charges which CardConnect has taken from Plaintiffs.  Indeed, CardConnect formats its statements so as to make it impossible for Plaintiffs to discover the nature and amount of all overcharges.  For example, rather than break down each type of credit and debit card that was swiped during the prior month so Plaintiffs can verify whether CardConnect is inflating pass-through interchange fees, CardConnect simply includes the vague line item "Interchange" with a lump sum.  Once Plaintiffs obtain the full level of detail needed to verify the legitimacy of the amounts they have been charged, they will detail the additional instances of overbilling.

59.     CardConnect has also seized or kept additional funds from Plaintiffs' account based upon improper fees, charges, assessments, and practices.  Despite complaints from Plaintiffs and their representatives, Defendant has failed to provide a proper accounting of all funds which it has refused to properly credit to Plaintiffs account.  The total extent of such amounts improperly retained by Defendant will not be known until discovery is undertaken.

60.     CardConnect will likely attempt to defend its conduct by arguing that it had the contractual discretion to increase fees or impose new fee categories.  However, even if there is a contract, the broad "change in terms" language is illusory, lacks mutuality, violates public policy, is unconscionable, and is thus unenforceable.

61.     Moreover, good faith and fair dealing constrains CardConnect's ability to use its discretion to add fees which were not contemplated by the parties.  For example, although a contract may leave discretion to create a new fee, and thereby profit one party to the other party's detriment, good faith and fair dealing precludes such improper conduct.  Thus, even if its self-granted ability to mark up rates and create new fees is enforceable, Defendant is bound to exercise its contractual discretion in good faith.  CardConnect's manipulation of Plaintiffs' fees

and charges was done for no other reason than to increase profits.  This does not comport with good faith and fair dealing.

62.     CardConnect may also argue that its billing manipulations are proper because it provided Plaintiffs with advance notice of such changes.  However, Plaintiffs were not provided with advance notice of some of the fee increases and new charges they have suffered (e.g., the premature imposition of the charge for purported PCI noncompliance).  Moreover, the form, format, and content of the statement notices given by CardConnect for some of the charges at issue did not provide the required 30 days notice and/or were insufficient to provide Plaintiffs with actual notice of the increases and were therefore ineffective.

63.     Plaintiffs have other ongoing disputes with CardConnect, including problems with the nightly batching of transactions and payment terminals which has caused errors in customer transactions and caused Plaintiffs to lose transaction funds.   If discovery shows similar widespread issues with such CardConnect services, Plaintiffs may seek leave to include claims as to these improper practices as well.

64.     Plaintiffs' experiences with CardConnect are not isolated, but rather are illustrative of Defendant's improper business practices towards its customers.

## CLASS ACTION ALLEGATIONS

65.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), Plaintiffs bring this class action on behalf of themselves and all those meeting the following class definition:

> All United States persons or entities charged unauthorized amounts
> for payment processing services by CardConnect.

Plaintiffs reserve the right to modify or amend the definition of the proposed Class, or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

66.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

67.     The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

68.     The proposed Class meets all requirements for class certification.  The members of the Class are so numerous that joinder is impractical.  The Class consists of, at the very least, thousands of members and the identity of those persons and entities is within the knowledge of Defendant and can be ascertained by resort to CardConnect's records.

69.     The claims of the representative Plaintiffs are typical of the claims of the Class. Plaintiffs, like all other members, were victimized by CardConnect's improper practices. Moreover, Plaintiffs, like all members, have incurred monetary damages as a result of CardConnect's misconduct.  Furthermore, the factual basis of Defendant's misconduct is common to members of the Class, and represents a common thread of conduct resulting in injury to all members of the Class.

70.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

71.     Among the questions of law and fact common to the Class are:

a.      Did CardConnect require merchants to enter the same or materially similar contracts during the Class Period;

b.      Whether CardConnect or Wells Fargo signed any customer contracts, thus accepting the terms as a condition precedent to the formation of a valid contract;

c.      When did CardConnect begin assessing or increasing each improper charge;

d.      Which of these charges are improper or unauthorized;

e.      Did merchants receive any tangible benefit from the improperly assessed charges;

f.      Was CardConnect unjustly enriched by its conduct;

g.      If a contract exists, did such contract include unconscionable or otherwise unenforceable provisions, including but not limited to those purporting to limit Defendant's liability, require early termination fees, require payment of Defendant's attorney's fees, and allow Defendant to disregard the agreed upon fees and charges;

h.      Did CardConnect breach contractual provisions in assessing improper charges; and

i.      Did CardConnect breach the covenant of good faith and fair dealing.

72.     Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory or other equitable relief to which the Class may be entitled.

73.     Plaintiffs' claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices and the same or substantially similar unenforceable provisions of the unexecuted contracts and related documents.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

74.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is

small relative to the complexity of the litigation, and due to the financial resources of CardConnect, most Class members could not afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

76. Even if Class members themselves could afford such individual litigation, the court system could not. Individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

77. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendant.

78. Defendant has refused to correct its conduct and such inaction is generally applicable to the Class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the Class as a whole. Specifically, CardConnect continues to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions. Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

## REQUESTS FOR RELIEF

### COUNT ONE
### DECLARATORY AND INJUNCTIVE RELIEF –
### NO BINDING CONTRACT EXISTS

79.     Plaintiffs repeat paragraphs 1 through 78 above.

80.     Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

81.     Defendant has established a system through which it obtains merchant signatures on its form Applications but it does not itself sign (or have Wells Fargo sign) the contract. However, because the Application requires CardConnect and its member bank to both sign the Application before a contract can "take effect," no contractual relationship is ever actually formed between the parties.

82.     A judicial declaration as to whether a contract exists is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

83.     The Court should use its equitable powers to declare that (1) the unexecuted contracts (consisting of Application and Program Guide purportedly incorporated by reference) are not binding contracts and (2) Plaintiffs and the Class are not bound by any of the terms set forth in the contract (including early termination fees).

### COUNT TWO
### UNJUST ENRICHMENT

84.     Plaintiffs repeat paragraphs 1 through 83 above.

85.     Plaintiffs assert a common law claim for unjust enrichment.  Given the parties do not have an enforceable contractual relationship, unjust enrichment will dictate that Defendant disgorge all improperly assessed card fees.

86.     As alleged herein, CardConnect was unjustly enriched at the expense of Plaintiffs and the other members of the Class, who were grossly and inequitably overcharged for payment processing services.

87.     Plaintiffs and the other members of the Class were unjustly deprived of money obtained by Defendant as a result of the improper and excessive fees that CardConnect charged to and collected from Plaintiffs and the other Class members.

88.     It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other members of the Class as a result of their wrongful conduct alleged in this Complaint.

89.     Plaintiffs and the other Class members are entitled to seek and do seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

**COUNT THREE**
**BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

90.     Plaintiffs repeat paragraphs 1 through 89 above.

91.     This claim is brought in the alternative to Counts One and Two, *supra*.  In the event the contract is found to be binding, the actions taken by CardConnect have materially violated the specific terms of such contracts.  CardConnect is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

92.     CardConnect violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, and charges which should have been waived, and by unilaterally marking up agreed-upon fees and charges without legal basis and without proper notice.  Thus, CardConnect has materially breached the express terms of its own form contract.

93.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by CardConnect.

94.     Plaintiffs and members of the Class sustained damages as a result of CardConnect's breaches of contract.

95.     Given the contract's stipulation that Pennsylvania law applies, the elements of breach of contract are identical for all members of the Class.

96.     Pennsylvania law also imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

97.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

98.     By charging fees that are inconsistent with those laid out in the contract, including but not limited to increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, CardConnect has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if CardConnect believed that it had given itself contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing under Pennsylvania law and Defendant's actions do not comport with this duty.

99.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no excuse or defense for CardConnect's conduct under Pennsylvania law.

100.     Plaintiffs and members of the Class sustained damages as a result of CardConnect's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.  As such, all elements for a successful claim under Pennsylvania law have been satisfied.

**COUNT FOUR**
**DECLARATORY AND INJUNCTIVE RELIEF –**
**INVALIDITY OF CERTAIN CONTRACT TERMS**

101.     Plaintiffs repeat paragraphs 1 through 100 above.

102.     Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

103.     Defendant has increased agreed-upon fees and rates and attempted to immunize itself from liability for its practices by burying provisions in the adhesive contract that purport to make it virtually impossible for merchants to obtain relief from Defendant's overbilling practices.  These provisions include but are not limited to the following sections of the Program Guide:  19.4, 19.10, 21.4, 21.5, 22.3, 24.2, 34.3, and 35.7.

104.     Such provisions should be deemed unenforceable on multiple grounds, including because they are illusory, lack mutuality, and violate public policy.

105.     Moreover, considering the great business acumen and experience of Defendant in relation to Plaintiffs and the members of the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar

public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law. This is especially true with respect to Plaintiff Mr. Kao, an individual consumer. Mr. Kao is obligated to pay any obligations which the restaurant cannot cover.

106.   Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

107.   The Court should use its equitable powers to declare these provisions to be unenforceable and enjoin their enforcement.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial on all claims so triable and judgment:

1.   Certifying this case as a class action pursuant to Fed. R. Civ. P. 23;

2.   Awarding declaratory and injunctive relief as requested herein;

3.   Awarding restitution of all improper fees and charges paid to Defendants by Plaintiffs and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

4.   Compelling disgorgement of the ill-gotten gains derived by Defendants from its misconduct;

5.   Awarding actual damages in an amount according to proof;

6.   Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

7.   Awarding pre-judgment interest at the maximum rate permitted by applicable law;

8.   Reimbursing all costs and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.   Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury to the full extent permitted by law.

**Respectfully submitted,**

**Dated:  November 1, 2016**

*/s/ KJG2445*

Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email: rgolomb@golombhonik.com
          kgrunfeld@golombhonik.com

E. Adam Webb, Esquire
**WEBB, KLASE & LEMOND, LLC**
(*Pro Hac Vice to be Filed*)
1900 The Exchange, SE, Suite 480
Atlanta, Georgia 30339
Phone: (770) 444-0773
Fax:    (770) 444-0271
Email: Adam@WebbLLC.com

*Attorneys for Plaintiffs*