# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEH SHOU KAO and T S KAO, INC., on behalf of themselves and all others similarly situated,<br><br>                  **Plaintiffs,**<br><br>              v.<br><br>**CARDCONNECT CORP.,**<br><br>                  **Defendant.**<br><hr><br>**TECH LOUNGE SP, LLC and THE LAW OFFICE OF KEVIN ADAMS, PLLC,** on behalf of themselves and all others similarly situated,<br><br>                  **Plaintiffs,**<br><br>              v.<br><br>**CARDCONNECT CORP.,**<br><br>                  **Defendant.** | Consolidated Civil Action No. 2:16-cv-5707<br><br>HON. J. WILLIAM DITTER |

## RESPONSE IN OPPOSITION TO DEFENDANT'S PROPOSED TERMS OF IMPLIED CONTRACT

E. Adam Webb
Matthew C. Klase
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, SE, Suite 480
Atlanta, GA 30339

Richard M. Golomb
Kenneth J. Grunfeld
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102

*Counsel for Plaintiffs*

To ascertain the relevant terms of the parties' implied-in-fact contract, the Court must answer two questions: (1) what pricing terms did the parties agree to when they started their relationships; and (2) did the parties subsequently assent to modify these pricing terms? These are straightforward issues that can be determined by applying well-established Pennsylvania law to undisputed material facts. Nevertheless, CardConnect's Memorandum (Dkt. No. 61) goes to great lengths to complicate the analysis as much as possible, including by invoking the laws of multiple states, relying on non-material facts, and setting up and knocking over straw man arguments. Fortunately, however, answering the salient questions is not difficult.

<u>What Were the Agreed-Upon Pricing Terms?</u> – CardConnect cannot legitimately claim that the parties agreed to anything other than the pricing terms set forth in the Service Fee Schedules. After all, these are the processing fees and rates CardConnect offered to charge. More importantly, Plaintiffs indicated their acceptance of these fees and rates by signing them. Under the law, this objective manifestation of assent trumps any secret, subjective intentions or beliefs each of the Plaintiffs may have held at the time they signed.

<u>Did the Parties Subsequently Agree to Modify the Pricing Terms?</u> – CardConnect argues that Plaintiffs assented to the modification of the pricing terms when they failed to object to statement notices CardConnect provided purporting to increase or add fees. This "acceptance by inaction" premise fails for multiple reasons. For those fees as to which CardConnect did provide some measure of advance notice (e.g., new junk fees [Dkt. No. 60, §§ B(1), (3)]), Defendant's premise still fails because Plaintiffs had no obligation to review their statements for messages and/or lodge objections to proposed increases. Without such a legal duty, the law is clear that Plaintiffs' silence and non-responsiveness cannot possibly be deemed assent. CardConnect endeavors to manufacture assent by claiming that Plaintiffs "voluntarily" paid the new or

1

increased charges. But the evidence shows that CardConnect deducted processing charges before providing merchants with statements itemizing such fees. Thus, Defendant's insinuation that Plaintiffs "voluntarily" paid the unilaterally increased charges is false.

Moreover, CardConnect indisputably did ***not*** provide advance notice of certain disputed fees, such as the inflated interchange fees or the "Minimum Monthly Fees" imposed even during months when fees exceeded the monthly minimum. *See* Dkt. No. 60, §§ B(2), (4). CardConnect fails to explain how Plaintiffs could have assented to fees as to which they received no notice.

The Court should find that the Service Fee Schedules constitute the parties' implied pricing terms and that Defendant's attempts to unilaterally modify those terms were ineffective.

## ARGUMENT AND CITATION OF AUTHORITY

A. **No Conflict Exists Between Pennsylvania, Michigan, and Wisconsin Law.**

Until the recent briefing, the parties agreed that Pennsylvania law governed Plaintiffs' claim for breach of implied contract. *Compare* Dkt. No. 44, pp. 19-24 *and* Dkt. No. 46, pp. 10-11 (CardConnect applying Pennsylvania law) *with* Dkt. No. 45, pp. 12-14 (Plaintiffs doing same). Now, CardConnect has switched gears and argues that the Court should apply the laws of Michigan and Wisconsin, the states where Plaintiffs are located. *See* Dkt. No. 61, pp. 2-3.

In diversity of citizenship cases such as this one, courts apply the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). In Pennsylvania, the first step is to determine if the state laws are in conflict. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) ("the first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws"). If there is no conflict, courts "may bypass the choice-of-law issue, rely interchangeably on the law[s] of [the relevant] states, and presume the law of the forum state controls." *Atlantic Pier Assocs., LLC v. Boardakan Rest. Partners*, 647 F. Supp. 2d 474, 487 (E.D. Pa. 2009).

2

Here, the law of Pennsylvania, Michigan, and Wisconsin on implied contracts is *not* in conflict – a fact Defendant admits in a footnote. *See* Dkt. No. 61, p. 3 n.3. Indeed, each state law classifies implied-in-fact contracts as contracts which are objectively inferred from the parties' actions in light of the surrounding circumstances. *E.g.*, *Stephan v. Waldron Elec. Heating and Cooling LLC*, 100 A.3d 660, 668 (Pa. Super. Ct. 2014); *Anton v. SBC Global Servs., Inc.*, 350 Fed. Appx. 39, 43 (6th Cir. 2009) ("Under Michigan law, the terms of an implied-in-fact contract are 'determined by [the parties'] conduct or other pertinent circumstances surrounding the transaction'") (quotation omitted); *Dickman v. Vollmer*, 736 N.W.2d 202, 208 (Wisc. App. 2007) ("An implied contract may be established by the parties' conduct . . . if from such conduct it can fairly be inferred that the parties mutually intended to agree on all the terms"). Because the laws are not in conflict, and the parties previously agreed that Pennsylvania implied contract law governed, the Court should apply Pennsylvania law.[1]

**B.** **The Parties Agreed to the Pricing Set Forth in the Service Fee Schedules.**

CardConnect argues that Plaintiffs should be judicially estopped from "taking the position that the written agreement in this case is unenforceable, and then after prevailing on that position, taking the contrary position that the written merchant application constitutes the parties' agreement." *See* Dkt. No. 61, p. 1 n.1. But Plaintiffs do not contend that the Application is the agreement. Rather, Plaintiffs contend that a distinct part of the Application – the Service Fee

---

[1] Defendant's newfound claim that state contract laws other than Pennsylvania may apply is a chess move. CardConnect is laying the groundwork to argue at the class certification stage that because it has customers throughout the nation, the implied contract law of each state will need to be applied, and the application of multiple state laws will make litigation of the case on a class-wide basis unmanageable. Plaintiffs will show at the appropriate time, however, that not only are all states' laws on breach of implied contract materially uniform (as Defendant concedes for Pennsylvania, Michigan, and Wisconsin) but that, even if they were in conflict, Pennsylvania has a greater interest in the application of its law in this case, such that Pennsylvania law should apply to all class members. *Hammersmith*, 480 F.3d at 231 (where there is a true conflict, the court must determine "which state has the greater interest in the application of its law").

3

Schedule – provides the best objective evidence of the pricing terms of the implied contract. Defendant's assertion that the terms of an implied contractual agreement can never be derived from an ineffective written contract is wrong. In *Stephan*, after concluding that the parties' actions evidenced an implied-in-fact contractual relationship, the court proceeded to decide the pricing for the services. 100 A.3d at 669. After noting that the typical standard is "reasonable value of the service," the court held that such a finding was unnecessary because "[the] prices are contained in the contract." *Id.* Thus, the court used an ineffective written contract signed by a party to determine the agreed-upon pricing. *See also Walney v. SWEPI LP*, 2015 WL 5333541, *14 (W.D. Pa. Sept. 14, 2015) (certifying class because terms of implied contract would be determined based on examination of ineffective form contracts).

Here, CardConnect does not (and cannot) dispute that (1) it prepared a Service Fee Schedule for each Plaintiff that set forth the pricing (Dkt. No. 60-3 – 60-5), (2) each Plaintiff received and signed the Application containing the Service Fee Schedule prior to doing business with CardConnect (*id.*), and (3) CardConnect initially proceeded to process each Plaintiff's transactions at the pricing set forth in their Service Fee Schedule. Even CardConnect's own Designation of Implied Terms acknowledges that the parties agreed to the "fees that would commence at levels outlined on a Merchant Processing Application." *See* Dkt. No. 61-2, ¶¶ 1 (Lucky 7); 1 (TechLounge); 1 (Adams Law); *also, e.g., id.* at ¶¶ 6-7 (summarizing fees from Service Fee Schedule that the parties agreed Lucky 7 would pay); 6 (same as to TechLounge); 6-7 (same for Adams Law)*;* Dkt. No. 61, p. 8 (claiming Adams Law's Service Fee Schedule contained "fees that would be assessed at the outset of his relationship with CardConnect"). These undisputed facts lead an objective observer to only one rational conclusion – the parties impliedly agreed to the fees and rates set forth in the Service Fee Schedules.

Nonetheless, CardConnect endeavors to confound the issue by claiming that the Court must also look beyond the Service Fee Schedules to determine the pricing terms the parties agreed upon at the outset of their relationship, including by delving into (a) Plaintiffs' secret, individual reasons for contracting with CardConnect, (b) what Plaintiffs discussed with CardConnect sales agents before they signed the Service Fee Schedules, (c) whether Plaintiffs read the Service Fee Schedules before signing them, and (d) what Plaintiffs believed they would pay for CardConnect's services. *See* Dkt. No. 61, pp. 5-15. Such subjective facts and intentions are, however, simply not material to the analysis.

"An implied contract is an agreement which legitimately can be inferred from the intention of the parties as evidenced by the circumstances and 'the ordinary course of dealing and the common understanding of men.'" *Martin v. Little, Brown and Co.*, 450 A.2d 984, 987 (Pa. Super. Ct. 1981) (quotation omitted). "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482-83 (Pa. Super. Ct. 1984); *Tillman v. Macy's, Inc.*, 735 F.3d 453, 459 (6th Cir. 2013) (same under Michigan law); *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 272 (7th Cir. 1994) (same under Wisconsin law).

Signing a document is an ordinary and common manner of manifesting assent to its terms. *Ohio Valley Energy Sys. Corp. v. DL Resources, Inc.*, 2016 WL 7107972, *7 (W.D. Pa. Dec. 5, 2016). Just as in *Stephan*, Plaintiffs' signing of the Applications containing the Service Fee Schedules prepared by CardConnect provided clear evidence of their intent to be bound by the pricing terms set forth therein. 100 A.3d at 669. As Defendant as previously argued to this Court, this outward and objective manifestation of assent trumps any subjective beliefs of

5

Plaintiffs. *See* Motion to Dismiss (Dkt. No. 11), p. 12 ("'The fact that an individual has signed [a] contract is strong evidence that he or she is thereby expressing his or her unconditional assent, and, unless there is some evidence to the contrary, it may be conclusive'") (quoting *Daniel Adams Assocs., Inc. v. Rimbach Publ'g, Inc.*, 519 A.2d 997, 1004 (Pa. Super Ct. 1987)).

It would be bad faith for CardConnect to claim that pricing *other than* the fees and rates set forth in the Service Fee Schedules was agreed-upon at the time Plaintiffs' owners signed. Indeed, if any Plaintiff had refused to pay CardConnect for its services, "exhibit A" to CardConnect's collection action would have been the signed Service Fee Schedule, not what Plaintiffs ***thought*** the agreed-upon pricing was. By way of further illustration, Nena Fisher of TechLounge informed CardConnect's sales agent at the time of enrollment that she did not want to be enrolled in CardConnect's "Merchant Club" or pay the "Merchant Club Fee." Despite Ms. Fisher's beliefs, the Merchant Club Fee nevertheless made it into the version of the Service Fee Schedule signed by her husband Chad (Dkt. No. 60-5, p. 5). Although TechLounge subjectively believes it rejected such fee, its objective signature establishes otherwise. Because the objective manifestation of assent is what matters, TechLounge must withdraw its claim that CardConnect's imposition of this fee was a breach. *See* Dkt. No. 61, pp. 6-7 (CardConnect arguing that because the fee is in the TechLounge Service Fee Schedule, TechLounge agreed to pay it).

Like Plaintiffs' subjective intentions, Plaintiffs' failure to closely read the Service Fee Schedules before signing them cannot supersede their signatures. As Defendant as previously advocated, "'[i]gnorance of the contents of a document or failure to read before signing is no defense to a contractual obligation under Pennsylvania law'". *See* Motion to Dismiss, p. 21 (quoting *Tose v. First Pa. Bank, N.A.*, 648 F.2d 879, 900 (3d Cir. 1981)). CardConnect cannot have it both ways, arguing on the one hand that the signed Service Fee Schedules control, but on

6

the other hand, the Court must also account for Plaintiffs' subjective and undisclosed beliefs and failure to read what they signed. The signed Service Fee Schedules are the best evidence.

C.      **The Parties Did Not Agree that CardConnect Had Discretion to Modify Fees.**

Recognizing that it cannot disavow the Service Fee Schedules that it drafted and Plaintiffs signed, CardConnect insinuates that such Service Fee Schedules merely contained introductory or initial pricing that CardConnect could unilaterally increase at its discretion. There is absolutely no evidence, however, that this was a term of the parties' implied contract. *See* Dkt. No. 60, p. 11. No portion of the Applications (including the Service Fee Schedules) nor any other documents signed by Plaintiffs, for instance, indicate that CardConnect could add or increase non-pass through fees and rates at its discretion. Nor was Defendant able to elicit deposition testimony from Plaintiffs that they were aware CardConnect could change its pricing.

Defendant argues that Plaintiffs' prior payment processors increased their fees and thus Plaintiffs should have known CardConnect would do the same. *See* Dkt. No. 61, pp. 9, 11. But CardConnect fails to provide any context for the prior processors' increases, such as whether they were allowed by contract, were increases of pass through or non-pass through fees, or whether Plaintiffs explicitly agreed to the modified fees. There is thus no foundation for Defendant to claim that Plaintiffs' prior experiences with other processors under *different* contractual relationships put them on notice that CardConnect would raise its non-pass through fees beyond those set forth in the Service Fee Schedules.

Even if CardConnect had such a right, it was bound to exercise its discretion in accordance with the duty of good faith and fair dealing, which Plaintiffs have shown it did not do. *See* Dkt. No. 60, pp. 14-15. Defendant did not raise fees to cover necessary costs; it did so to make more money at customer expense.

Despite Defendant's efforts to complicate it, the parties' deal was simple – CardConnect processes Plaintiffs' transactions in exchange for Plaintiffs' payment of the rates and fees set forth in the Service Fee Schedules.

### D. **Plaintiffs Never Assented to CardConnect's Purported Modifications.**

In what is another straw man argument, CardConnect claims "Plaintiffs' position is that the Service Fee Schedule implied contract could ***never be modified*** at any time in the future . . .." *See* Dkt. 61, p. 1 (emphasis added). Again, Plaintiffs have not taken such a position.

The pricing set forth in the Service Fee Schedules, like any contractual terms, were subject to modification ***if both parties agreed***. *Allstate Ins. Co. v. Tokio Marine & Nichido Fire Ins. Co.*, 464 F. Supp. 2d 452, 457 (E.D. Pa. 2006) (if consent "is absent from an attempt to modify a contract, then the proposed modification is void and the contract continues to operate as originally constructed"); *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003) ("one cannot unilaterally modify a contract because by definition, a unilateral modification lacks mutuality"); *Nelsen v. Farmers Mut. Auto. Ins. Co.*, 90 N.W.2d 123 (Wisc. 1958) ("one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification").

Thus, so long as both parties agreed to the modification, the pricing set forth in the Service Fee Schedules could be modified. This is what occurred when "two of the three Plaintiffs requested and obtained modification of fees." *See* Dkt. No. 61, p. 1. Indeed, Plaintiffs called and sought refunds for certain fees appearing on their Service Fee Schedules and CardConnect agreed and took action to refund the charges. *See* Dkt. No. 61, p. 6 (describing TechLounge refund), p. 13 (Lucky 7 refunds). Under such circumstances, there was mutual assent and the pricing terms were successfully modified.

There was, however, no mutual assent to Defendant's *unilateral* price increases. CardConnect, for instance, never called or met with Plaintiffs to negotiate whether they would be willing to pay higher fees or new fees for CardConnect's existing services (e.g., CARDPOINTE FEE, EMV/P2PE FEE) or whether they wanted to engage CardConnect to provide new services and pay the associated fee (e.g., DATA BREACH FEE). Instead, Defendant just helped itself to increased fees either (1) without first providing any advance notice [*see* Dkt. No. 60, §§ B(2), (4) (describing fees where no notice provided)] or (2) after slipping messages that often contained multiple falsities into Plaintiffs' monthly statements. *Id.* at §§ B(1), (3); D. CardConnect then deemed Plaintiffs' *failure to respond* to be a basis for concluding that Plaintiffs had accepted the purported modifications. *E.g.*, Dkt. No. 60-23, p. 3 ("IF YOU DO NOT TAKE ANY ACTION YOU WILL BE DEEMED TO HAVE OPTED IN TO THIS PROGRAM . . . .").

The law is clear, however, that silence or inaction will not constitute acceptance of an offer in the absence of a duty to speak or act. *See* Dkt. 60, pp. 13-14; *also, e.g.*, *Smithson v. Koons*, 2017 WL 3016165, *5 (E.D. Pa. June 26, 2017) ("[one party's] unilateral attempt to impose a contractual obligation did not create a duty on the part of the [other parties] to respond, and their mere silence, in the absence of any intent by them to be bound, could not create a valid contract"); *Turner Assocs., Inc. v. Small Parts, Inc.*, 59 F. Supp. 2d 674, 681 (E.D. Mich. 1999) ("the general rule is that silence alone will not constitute a valid acceptance"); *Sell v. General Elec. Supply Corp.*, 278 N.W. 442, 447 (Wisc. 1938) ("'Generally speaking an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer'") (quotation omitted).

Here, Plaintiffs had no continuing duty or obligation to review their statements, let alone respond to Defendant's unsolicited offers to increase the previously agreed-upon fees. *See* Dkt.

No. 60, pp. 13-14. Thus, Plaintiffs' lack of response to CardConnect's statement messages (such as by demanding that CardConnect adhere to the Service Fee Schedules or terminating their accounts) cannot reasonably be construed as assent. *Kelvin Cryosystems, Inc. v. Lightnin, a Div. of SPX Corp.*, 2005 WL 2994693, *8 (E.D. Pa. Sept. 28, 2005) (finding plaintiff not bound by new terms unilaterally added to invoices by defendant).

This is especially true of merchants like Plaintiffs Lucky 7 and Adams Law that were bound to pay a hefty penalty if they terminated the accounts early. *E.g.*, Lucky 7 Application, p. 2 (noting $750 Early Termination Fee) (Dkt. 60-3); Adams Law Application, p. 2 (same) (Dkt. 60-4). Such merchants had no reasonable choice **but** to continue their accounts with Defendant and sue for breach (which they have done). Defendant counters by claiming that "each Plaintiff knew they had the right to terminate the agreement if they were dissatisfied with the fees." *See* Dkt. No. 61, p. 2. CardConnect, however, cites no evidence in support of this position. None of the documentation signed by Plaintiffs purports to give them such penalty-free termination rights, nor do any of the statement messages inform Plaintiffs of such rights. At most, the statement messages regarding increases say things like, "IF YOU HAVE ANY QUESTIONS, PLEASE CALL THE CUSTOMER SERVICE NUMBER LISTED AT THE TOP OF YOUR STATEMENT." *See* Dkt. No. 60-17. Such vague messages most certainly do **not** inform merchants that they can terminate penalty-free if they do not assent – a fact CardConnect's Chief Operating Officer admitted. *See* CardConnect Dep., pp. 69:9 – 71:2 (Exh. A hereto).

CardConnect endeavors to manufacture assent by claiming Plaintiffs "voluntarily" paid the increased charges. *See* Dkt. No. 61, p. 2. However, this is not a typical case where a party receives a bill, reviews it, and then voluntarily sends a check. Defendant's system is set up so that it automatically debits the prior month's charges from Plaintiffs' accounts **before**

CardConnect provides a statement itemizing such charges. *See* Dkt. No. 60, p. 5 (proving fees from October deducted on November 2 and statement not sent until November 5). This fact is evident on the face of every CardConnect statement, which prominently notes "THIS IS NOT A BILL." *E.g.*, Dkt. No. 60-15, p. 1. Because CardConnect deducts the totality of the prior month's fees from merchant accounts ***before*** informing them of the nature and amount of each charge, it cannot be said that Plaintiffs' "voluntarily" paid the overcharges.

CardConnect places great emphasis on the unpublished decision of *Kell & Lynch, P.C. v. Pappas*, 2006 WL 2010214 (S.D. Ohio July 17, 2006), but the facts in that case are inapposite. *See* Dkt. No. 61, pp. 3-5. In *Pappas*, a business engaged a law firm to defend its interests in litigation. *Pappas*, 2006 WL 2010114 at *1. The law firm sent monthly invoices to the business summarizing the hours worked and rates charged for each attorney. *Id.* In July and August 2001, the law firm increased the hourly rates of its attorneys and noted such increases on the invoices that it sent to the attention of the business' owner. *Id.* at *2. The business paid the invoices for more than a year at the increased rates. *Id.*

By mid-2002, the business was struggling financially, so to induce the law firm to continue its representation of the business, the owner personally guaranteed the payment of all fees "presently existing or hereinafter arising from or related to [the litigation]." *Id.* at *2. The business subsequently filed for bankruptcy and the owner refused to honor the personal guaranty so the law firm sued. *Id.* at *4-5.

The owner argued that because he never consented to the July and August 2001 billing rate increases, he was only liable for fees at the original billing rates. *Id.* at *7. The court concluded, however, that when the owner guaranteed the business' "presently existing" indebtedness in June 2002, he was aware of the increased rates, having received and paid

11

invoices at such rates for more than a year. *Id.* In short, the evidence showed knowledge of the firm's rates at the time he executed the personal guaranty and thus consent to pay such rates.

Here, by contrast, there is no evidence Plaintiffs were on notice CardConnect would increase its fees at the time they agreed to do business with CardConnect, let alone the nature and amount of such increases. Thus, unlike in *Pappas*, it cannot be said that Plaintiffs impliedly agreed to such modifications. Based on the circumstances of this case and the undisputed evidence, it is clear Plaintiffs' failure to respond to the statement messages ***cannot*** be deemed assent to CardConnect's unilateral price increases.

At worst, however, whether Plaintiffs consented to the modifications by silence and inaction is a question for the trier of fact. *E.g.*, *In re Windsor Communications Group, Inc.*, 53 B.R. 297, 298-99 (E.D. Pa. 1985) (whether silence constituted acceptance based on circumstances at issue was one of fact); *Turner Assocs.*, 59 F. Supp. 2d at 682 ("under Michigan law whether in fact defendant had accepted that offer in spite of its silence is a question of fact for the jury's consideration"); *Morris F. Fox & Co. v. Lisman*, 240 N.W. 809, 811 (Wisc. 1932). For instance, even assuming Plaintiffs had a duty to review their statements for messages, the messages themselves were craftily designed by CardConnect to go unnoticed and often contained misleading and, in some cases, even false information. *See* Dkt. No. 60, pp. 4-11 (e.g., CardConnect falsely labeled junk fees as permissible "pass through" charges; messages indicated certain fees were going to be charged when they were not – thus causing Plaintiffs to rightfully disregard them; and messages stated fees were only applicable to certain customers, etc.). If the Court does not accept as a matter of law that Plaintiffs had no obligation to respond to CardConnect's fee notices then, at the very least, the issue of whether the format, location, and content of such messages was sufficient to put Plaintiffs on notice that Defendant was making

modification offers that would be deemed accepted if Plaintiffs failed to respond is a question of fact.

**E.      The Subject Fees.**

For the sake of clarity, Plaintiffs hereinafter list the fees they allege were charged in violation of their Service Fee Schedules:

1.      Lucky 7.  Lucky 7 challenges several junk fees that are indisputably not identified on its Service Fee Schedule but that CardConnect nevertheless deducted from its account, namely the CARDPOINTE FEE, EMV/P2PE FEE, PULSE PARTICIPATE FEE, STAR PARTICIPATE FEE, BIN/ICA FEE, NYCE PARTICIPATE FEE, and ACCEL ANNUAL FEE. As shown above, Lucky 7's Service Fee Schedule was never modified to allow for such fees. *See* pp. 8-12, *supra*; *also* Dkt. No. 60, pp. 5-15.

CardConnect claims that some of the fees challenged by Lucky 7, including the PULSE PARTICIPATE FEE, STAR PARTICIPATE FEE, BIN/ICA FEE, NYCE PARTICIPATE FEE, and ACCEL ANNUAL FEE are "pass through fee[s] that Plaintiffs acknowledge are permissible." *See* Dkt. No. 61, p. 14. While it is true Plaintiffs agreed to pay pass through fees in the Service Fee Schedules (Lucky 7 Application, p. 2), CardConnect offers no evidence that the identified fees are true pass through fees. The undisputed fact that such fees are only charged to some merchants, but not others, suggests that they are actually junk fees that are not mandated by the card networks. This is an issue of fact that cannot be resolved at this stage.

CardConnect also claims that Lucky 7 should not be heard to complain about the EMV/P2PE FEE because CardConnect refunded this fee. *See* Dkt. No. 61, p. 14 (citing a $95 refund issued on Lucky 7's January 2017 statement). However, CardConnect offers no evidence proving the refund it issued in January 2017 was for the EMV/P2PE FEE as opposed to other

13

fees or disputes. CardConnect Dep., p. 131:1-17 (CardConnect testifying it does not have any information about the refund). Nor is there any evidence as to whether Lucky 7 requested a refund of the EMV/P2PE FEE or whether CardConnect proactively refunded it in an attempt to moot Plaintiff's standing to challenge it. *Id.* The nature and impact of this refund is a question for another day.

Finally, CardConnect bemoans the fact that Lucky 7 continues to do business with CardConnect, despite all of its fee complaints. *See* Dkt. No. 61, p. 15. However, Lucky 7 has remained with CardConnect for one simple reason – since the case was filed, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. By way of example, in January 2017, Lucky 7 received a statement with a message that the "plus" on its interchange plus pricing would increase by .5% (or 50 basis points) effective February 2017. *See* Dkt. No. 60-9. This increase would have *tripled* the "plus" rate set forth in Lucky 7's Service Fee Schedule, from .25% to .75%. However, CardConnect executives ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ (Exh. B hereto); CardConnect Dep., pp. 127:15 – 128:13 ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅. ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ CardConnect Dep., p. 128:15-18. To summarize, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅.



2. <u>Adams Law.</u> This Plaintiff agreed on its Service Fee Schedule to pay a "Minimum Monthly Fee" of $10.00, meaning that it would pay a fee of at least $10.00 to

CardConnect every month even if it did not process any card transactions. Adams Application, p. 2 (Dkt. No. 60-4). Defendant, however, charged this fee even during months when Adams Law was already paying more than $10.00 to CardConnect via other fees. *E.g.*, Dkt. No. 60-11, p. 5. In other words, Plaintiff claims CardConnect charged the fee in direct violation of the terms of the Service Fee Schedule. CardConnect never provided advance notice to Plaintiff that it would charge the fee in such circumstances. Dkt. No. 60, § D.

Adams Law also challenges three junk fees that are indisputably not identified on its Service Fee Schedule but that CardConnect nevertheless deducted from its account: LOCATION FEES, EMV/P2PE FEE, and DATA BREACH FEES. As shown above, Adams Law's Service Fee Schedule was not modified to allow for such fees. *See* pp. 8-12, *supra*; *also* Dkt. No. 60, pp. 5-15.

3.  TechLounge. This Plaintiff alleges that CardConnect contracted to pass through interchange rates at cost, but subsequently inflated them. *See* TechLounge Application, p. 2; Dkt. No. 60-5; Dkt. No. 60, § (B)(2). No advance statement message disclosing the increase was provided. Dkt. No. 60, § D. CardConnect concedes this inflation was a breach, classifying it as "a damages issue and not related to the implied contract terms." Dkt. No. 61, p. 7.

## CONCLUSION

The Court should find that the parties agreed to the pricing set forth in the Service Fee Schedules and that CardConnect's attempts to unilaterally modify such terms were ineffective.

**Dated: April 13, 2018**

**Respectfully submitted,**

*/s/ E. Adam Webb*

E. Adam Webb, Esquire
Matthew C. Klase, Esquire
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, SE, Suite 480
Atlanta, GA 30339
Phone: (770) 444-0773
Fax:    (770) 217-9950
Email: Adam@WebbLLC.com

Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email: rgolomb@golombhonik.com
       kgrunfeld@golombhonik.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of April, 2018, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ E. Adam Webb*
E. Adam Webb
