# **EXHIBIT**

# **B**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**TEH SHOU KAO and T S KAO, INC., on behalf of themselves and all others similarly situated,**

**Plaintiffs,**

**v.**

**CARDCONNECT CORP.,**

**Defendant.**

---

**TECH LOUNGE SP, LLC and THE LAW OFFICE OF KEVIN ADAMS, PLLC, on behalf of themselves and all others similarly situated,**

**Plaintiffs,**

**v.**

**CARDCONNECT CORP.,**

**Defendant.**

Consolidated Civil Action No. 2:16-cv-5707

HON. GERALD J. PAPPERT

## JOINT DECLARATION OF E. ADAM WEBB AND MATTHEW C. KLASE

1.      We are lead counsel for Plaintiffs in the above-referenced matters and submit this joint declaration in support of the unopposed motion for preliminary approval and to direct notice to settlement class.  Unless otherwise noted, we have personal knowledge of the facts set forth in this declaration and could testify competently to them if called upon to do so.

**A.      Qualifications and Introduction.**

2.      E. Adam Webb is a lawyer licensed in Georgia who has been admitted to practice in the state and federal courts of Georgia, numerous federal circuit and district courts, and the Supreme Court of the United States.  He is a founding partner of Webb, Klase & Lemond, LLC in Atlanta,

Georgia and has practiced law since 1996.  After graduating from Harvard, he attended law school at the University of Georgia, where he served on Law Review and was a member of the Order of Barristers.  After law school, he worked for Dow, Lohnes & Albertson's Atlanta office for several years before starting his own firm.  Webb, Klase & Lemond, LLC was formed in 2003.  He has served as lead counsel in numerous successful class actions.

3.      Matthew C. Klase has practiced law for 18 years and is a partner at Webb, Klase & Lemond.  After earning his law degree from The Ohio State University, Mr. Klase associated at Gordon & Rees, LLP, in San Francisco, California, before joining what is now Webb, Klase & Lemond in 2005.  For the last decade, he has spent the majority of his practice representing plaintiffs in complex class action and multi-district litigation and has served as class counsel in many federal and state class actions.

4.      Webb, Klase & Lemond's firm résumé is attached hereto as Exhibit 1.

5.      Based on our extensive investigation, our discussions with former employees and customers of Defendant CardConnect Corp. ("CardConnect"), our evaluation of the substantial written discovery provided by CardConnect, our deposition of many CardConnect witnesses, our analysis of this Court's rulings, the work of our expert, our knowledge of the payment processing industry, our interactions with the mediator, and our prior experience serving as lead counsel and in other leadership positions in major class action litigation, it is our opinion that the proposed settlement in this case is fair, adequate, and reasonable so as to satisfy the requirements for preliminary – and ultimately – final approval.  We do not hesitate to endorse it to this Court and the class members.

**B.**      **Procedural History.**

6.      We were first contacted by Jenny Shee, part owner of Plaintiff T S Kao, Inc. d/b/a Lucky 7 Chinese Food ("Lucky 7"), in September of 2016.

7.      Ms. Shee contended that Lucky 7 had been overcharged by CardConnect for payment processing services and sought our assistance after learning about our representation of other merchants in a similar class action case against Mercury Payment Systems, LLC.

8.      Our review of Lucky 7's contract and statements revealed that (a) the service contract had not been signed by CardConnect or its member bank – an explicit condition to the contract's effectiveness – and (b) CardConnect had charged Lucky 7 several fees that were either not identified on the contract's fee schedule or were greater than the amounts identified on the fee schedule.

9.      Rather than rush to Court, we prepared and sent a letter to CardConnect notifying it of the excessive fees and seeking reimbursement and other related relief.  We discussed the matter with CardConnect's independent sales agent Ryan Anderson in October 2016, who informed us that CardConnect was not willing to return any of the challenged fees.

10.      At this point, an extensive investigation was undertaken to better understand Defendant and its practices.  Most importantly, Ms. Shee was interviewed and the entirety of Lucky 7's relevant documents (including the contract, statements, substantial email communications, and letters to/from CardConnect) were digested.

11.      We also spoke with an industry expert who had previously served as an independent sales agent for CardConnect about CardConnect's practices and reputation and researched online complaints concerning its billing practices, which we determined to be largely automated and standardized.

12.      After it was determined that the contract contained arguably enforceable Pennsylvania choice-of-law and venue provisions, Pennsylvania co-counsel was retained.  We chose Richard Golomb and Ken Grunfeld at Golomb & Honik, PC, whom we have worked with on several prior

class actions and know to be excellent, experienced class litigators.  The consideration of whether to proceed in state or federal court was extensive and ultimately this Court was chosen.

13.     Several drafts of the complaint were prepared, revised, and proofed.   On November 1, 2016, the original class action complaint was filed by Lucky 7 and co-owner and signatory to the CardConnect contract, Teh Shou Kao (Ms. Shee's husband and the other co-owner of Lucky 7).  The complaint sought a declaration that the contract was unenforceable for lack of signature and recovery for Defendant's fee increases via the doctrine of unjust enrichment.   The complaint also pled alternative claims for breach of contract (including via the covenant of good faith and fair dealing) and unconscionability.  *See* Dkt. 1.

14.     After the case was assigned to the Honorable Timothy Savage, the Judge's rules and prior relevant orders were evaluated.

15.     On November 17, 2016, CardConnect waived service.  *See* Dkt. 2.  On January 17, 2017, CardConnect moved to dismiss for failure to state a claim.  *See* Dkt. 11.  Among other things, the motion alleged Mr. Kao lacked standing, the contract became effective without signatures, the breach of contract and unconscionability allegations were insufficient, and the unjust enrichment claim failed as a matter of law in light of the existence of the contract.  *See* Dkt. 11, pp. 2-3.

16.     On February 6, 2017, Plaintiffs filed an amended complaint, which added additional factual detail supporting their breach and unconscionability allegations.  *See* Dkt. 14.  CardConnect thereafter withdrew its motion to dismiss the original complaint.  *See* Dkt. 16.

17.     On February 7, 2017, the case was reassigned to the Honorable J. William Ditter, Jr. *See* Dkt. 15.  Judge Ditter's rules and prior relevant orders were digested.

18.     On March 8, 2017, CardConnect answered the amended complaint.  *See* Dkt. 17.

19.     Thereafter, the parties met and conferred and completed the scheduling information report and discovery plan, which set forth the parties' proposals as to a case schedule and how discovery should proceed.  *See* Dkts. 22-23.

20.     During this time frame, the parties also exchanged initial disclosures and several drafts of (a) a protocol for the searching and production of electronically stored information and (b) a confidentiality order.

21.     On April 27, 2017, Judge Ditter convened a conference and decided to go in a different direction than that suggested by the parties.  He ordered the parties to immediately meet and confer on a revised discovery plan, exchange documents concerning the Plaintiffs, and prepare initial stipulations of fact.  *See* Dkt. 24.

22.     The parties met and conferred regarding a revised discovery plan but were unable to agree on the direction discovery should take.  Plaintiffs wished to proceed immediately with class discovery and Defendant desired to limit initial discovery to the named Plaintiffs.  Plaintiffs filed their proposed revised discovery plan.  *See* Dkt. 26.

23.     On May 10, 2017, Judge Ditter convened a teleconference to hear the parties' positions on discovery.  *See* Dkt. 29.  The Court approved Defendants' discovery plan to limit initial discovery to the named Plaintiffs' claims, set further deadlines for this initial discovery period, and approved the parties' proposed ESI protocol.  *Id.*

24.     The parties thereafter exchanged detailed interrogatories, requests for production, and requests for admissions, with each responding and producing responsive documents.  Plaintiffs gathered and produced approximately 600 pages of responsive documents, while CardConnect produced approximately 15,000 pages.  We reviewed, coded, and digested all of these documents.

25.     The parties took issue with each other's responses and productions and during the months of June and July 2017, exchanged detailed letter briefs concerning purported deficiencies. After several lengthy conferences and communications, the parties were ultimately able to resolve some of these discovery disputes without involving the Court and exchanged supplemental responses and additional documents.

26.     Meanwhile, the parties also exchanged several drafts of the initial stipulations of facts requested by the Court.  These stipulations were filed on June 26, 2017.  *See* Dkt. 32.

27.     On August 10, 2017, Judge Ditter convened a telephone conference where the parties discussed the parameters for a potential early resolution.  *See* Dkt. 37.  We had previously provided CardConnect with an itemized list of data our expert would need to evaluate class damages so as to enable us to engage in informed class settlement discussions and the Court ordered Defendant to respond.  *Id.*  Ultimately, Defendant did not agree to provide this information and thus no substantively settlement discussions were had.

28.     After the case was filed, it received minor publicity, which encouraged several other aggrieved CardConnect customers to reach out to our firm.  From November 2016 to August 2017, we received calls from a number of other former or current CardConnect merchants that made overbilling allegations similar to those of Lucky 7 and wanted to be added to the case as class representatives.  We reviewed these merchants' statements and documents, determining which had valid class claims and which did not.

29.     On September 7, 2017, a second class action complaint was filed by Plaintiffs Tech Lounge SP, LLC ("Tech Lounge") and The Law Office of Kevin Adams ("Adams Law") asserting largely the same claims as those that had been pled by Lucky 7.  *See* Dkt. 1 (Case No. 17-cv-4014-GJP).  This case was also assigned to Judge Ditter.

30.     On September 22, 2017, the parties submitted a status report wherein they requested that the cases be consolidated and sought guidance on outstanding discovery disputes.  *See* Dkt. 40.

31.     On September 26, 2017, Judge Ditter convened a telephone conference call wherein he ordered that the cases be consolidated.  *See* Dkt. 41.  The Court also determined that a key issue in the case was whether the parties' written contract was enforceable even though it had never been signed by Defendant or its member bank and instructed the parties to submit briefs on this issue, after which the Court would issue a ruling.  *Id.*

32.     Defendant submitted its brief, Plaintiffs responded, and Defendant replied.  *See* Dkts. 44-46.  Plaintiffs argued that the contract expressly conditioned effectiveness on signatures from CardConnect and its member bank and thus never took effect, which prohibited CardConnect from relying on the many exculpatory provisions included in the fine print of its form agreement.  *See* Dkt. 45.  Plaintiffs further argued that the parties had an implied-in-fact contractual relationship that was governed by the fee schedule Defendant provided to Plaintiffs at the outset of the relationship.  *Id.*

33.     On November 3, 2017, Judge Ditter convened a telephone conference where he announced his ruling that the parties' written contract was not effective for lack of required counter-signatures and the parties had an implied-in-fact contract.  *See* Dkt. 47.  However, Judge Ditter also found there may be a factual dispute over the terms of this implied agreement and ordered the parties to attempt to stipulate to the terms.  *Id.*

34.     Over the next few months, the parties exchanged their proposed implied contract terms and met and conferred, but were unable to stipulate to the terms.  On January 12, 2018, the Court ordered the parties to meet and confer on a schedule for discovery and briefing targeted to the issue of the implied contract terms, after which the Court would decide the issue.

35.     The parties thereafter met and conferred and, on January 19, 2018, the Court adopted the parties' proposed schedule.  *See* Dkt. 58.

36.     The parties thereafter exchanged a second round of interrogatories, requests for production, and requests for admissions, all tailored to the terms of the implied contract.  Each party responded and produced responsive documents.  Plaintiffs gathered and produced approximately 400 additional pages of responsive information, while CardConnect produced approximately 20,000 pages of additional documents.  We reviewed, coded, and digested all of these documents on an expedited basis in order to prepare for the upcoming depositions.

37.     In late February and early March 2018, the parties took a total of eight depositions, with Plaintiffs deposing CardConnect's 30(b)(6) witness, CardConnect Chief Operating Officer Patrick Shanahan, and CardConnect customer service specialist Brenda Stein in Philadelphia, Pennsylvania, and Defendants deposing Teh Shou Kao and Jenny Shee of Lucky 7 in Ann Arbor, Michigan, Kevin Adams of Adams Law in Livonia, Michigan, and Chad Fisher and Nena Fisher of Tech Lounge in Stevens Point, Wisconsin.

38.     Following the completion of this discovery, the parties each submitted briefs in support of their proposed contract terms (Dkts. 60-61) and in response to each other's briefs (Dkts. 65-66).  Plaintiffs argued that the parties agreed to the fees set forth in the fee schedules, while CardConnect argued that these fees had been amended via information communicated to each Plaintiff in their billing statements.

39.     On September 26, 2018, the Court found that:  (a) the parties agreed to the fees set forth in the service fee schedules; (b) the parties never agreed CardConnect had unilateral discretion to modify those fees; (c) CardConnect's argument was premised on the written contract, which the Court previously found to be unenforceable; (d) CardConnect seized fees

before providing itemized statements and did not always provide advance notices of increased fees; (e) the advance notices CardConnect did provide via statement messages of increased fees were ineffective to permit CardConnect's unilateral fee manipulations; and (f) some merchants faced paying an early termination penalty if they quit the deal.  *See* Dkt. 68, pp. 1-6.  Based on such findings, the Court held that:

> CardConnect agreed to provide its services for the fees and rates set forth in each Plaintiff's service contract and is limited to those terms absent a mutual modification of the implied contract.  All unsolicited and unilateral changes made in various billing statements that were not by mutual agreement are not binding on the plaintiffs.  In the absence of an allegation by CardConnect that a plaintiff agreed to a contract modification, the fees originally set forth stand.

*See* Dkt. 69.

40.     On October 10, 2018, this case was reassigned from Judge Ditter to the Honorable Gerald J. Pappert.  This Court's procedures and prior relevant rulings were studied.

41.     The very same day the case was reassigned, CardConnect moved for reconsideration of the Court's ruling or alternatively, for the Court to certify its order for interlocutory appeal.  *See* Dkt. 71.  Plaintiffs responded (Dkt. 72) and CardConnect replied (Dkt. 73).

42.     While Defendant's motion was pending, the Court convened a series of teleconferences during which time the potential for settlement was explored.  *See* Dkts. 74-77.  The case was referred to Magistrate Judge Elizabeth Hey to continue these discussions.  *See* Dkt. 78.

43.     The parties met and conferred on the scope of information and data CardConnect would need to provide to enable us to engage in informed settlement discussions on behalf of a class. We requested an identification of all former and current customers, the total amounts collected by CardConnect for several specific "subject fees," and contracts, statements, and billing data for a random, statistically significant sample of former and current customers.  CardConnect agreed to

provide enough of the requested information to allow informed discussions and Magistrate Judge Hey set a settlement conference for April 16, 2019.  See Dkt. 86.

44.    Over the course of the next several months, CardConnect gathered and provided the requested information.  It took CardConnect longer than anticipated to pull this information, which ultimately caused the settlement conference to be continued until June 10, 2019.

45.    Ultimately, CardConnect produced an additional 20,000 pages of contracts and monthly statements, as well as customer lists, detailed spreadsheets showing the subject fees charged to the sample merchants, and the aggregate amounts of the subject fees charged to all CardConnect merchants across the class period.

46.    To assist in the organization and breakdown of the voluminous billing data, we retained Kevin Jewell, a renowned data consultant whose expert testimony has been accepted by numerous courts.  Working in tandem with us, Mr. Jewell organized the data, wrote code to extract the alleged overcharges of the sample customers, extrapolated these damages across all customers, and created demonstrative exhibits detailing his findings for use at the settlement conference.  These exhibits were provided to CardConnect in advance of the mediation.

47.    We also researched and wrote a detailed confidential mediation statement that was provided to Magistrate Judge Hey.

48.    Despite these extensive efforts, the settlement conference was unsuccessful. CardConnect remained bullish on its prospect of prevailing on its motion for reconsideration and its ability to defeat Plaintiffs' eventual motion for class certification and refused to engage in what we considered to be "serious" negotiations.  As a result, Magistrate Judge Hey declared an impasse.

49.    On June 26, 2019, the Court entered an order denying CardConnect's motion for reconsideration and motion to certify its prior order for interlocutory appeal.  *See* Dkts. 98-99.

50.     On July 2, 2019, the Court convened a telephone conference and ordered the parties to stipulate to a schedule governing the remainder of the case.  *See* Dkt. 100.  The parties thereafter submitted a schedule governing class discovery, the class certification motion, and post-certification proceedings (if applicable), which was promptly approved by the Court.  *See* Dkt. 101.

51.     Plaintiffs immediately served their third requests for production of documents and requests for admissions on CardConnect.  CardConnect responded but Plaintiffs viewed their responses to be deficient, so the parties met and conferred.  After the exchange of several detailed written communications, the parties were unable to resolve their differences, so the Court held a telephone conference on October 11, 2019, during which time it provided guidance to the parties.

52.     In accordance with this guidance, Plaintiffs filed a stipulation narrowing the "subject fees" in dispute.  *See* Dkt. 103.

53.     Over the course of the next several months, the parties engaged in substantial and meaningful discovery.  CardConnect produced more than 1,000 pages of additional documents (including massive spreadsheets), all of which we reviewed and coded.

54.     The parties continued to have discovery disputes, some of which they were able to resolve informally and some of which they were not able to resolve.  For instance, on February 24, 2020, CardConnect sought a protective order to limit the scope of questioning at an upcoming deposition.  *See* Dkt. 105.  Plaintiffs responded (Dkt. 106) and the motion was denied (Dkt. 107).

55.     Plaintiffs took an additional four fact witness depositions during the class discovery period:  CardConnect employee Johnny Stevning in Denver, Colorado, and CardConnect employee Dan Arison, as well as two additional CardConnect Rule 30(b)(6) depositions, in Philadelphia, Pennsylvania.

56.     The parties also exchanged massive expert reports and deposed each other's experts: Kevin Jewell in Austin, Texas, and Sonya Kwon in Irvine, California.  Plaintiffs also submitted a rebuttal expert report from Mr. Jewell.

57.     In November 2019, while such discovery was in progress, the parties agreed to hold a mediation in Miami, Florida with well-regarded class action mediator Rodney Max of Upchurch, Watson, White, and Max, on March 13, 2020.  Defendant agreed to provide additional class data prior to the mediation and ultimately did provide such information (which was reviewed and analyzed by us and Mr. Jewell).

58.     To prepare for the mediation, we drafted a detailed mediation statement, which was provided to both CardConnect and Mr. Max.  This statement laid out substantial support on key issues in the case, such as our expert's ability to use CardConnect's billing and other data to ascertain class members and calculate damages, as well Plaintiffs' ability to ultimately prevail on their arguments that the "subject fees" were in breach of the fee schedules provided to the class members and defeat CardConnect's defenses (such as voluntary payment).  CardConnect responded by arguing that it did not maintain sufficient data to allow class member identities to be programmatically ascertained and thus a file-by-file review was necessary to both determine membership and calculate damages. CardConnect also remained confident on its merits defenses, including its reliance on the voluntary payment doctrine and its position that it would obtain a reversal on appeal of this Court's ruling on the validity of the written contract.

59.     On March 13, 2020, after a full day of contentious discussions, the parties were able to hammer out and execute a memorandum of understanding as to a class settlement.  The settlement resulted from arm's length, difficult negotiations that succeeded in part due to Mr. Max's active involvement.

60.    On March 18, 2020, the parties notified the Court of the settlement. *See* Dkt. 109.

61.    The agreement was contingent on CardConnect providing confirmatory discovery backing up its mediation estimate as to the percentages of former and current customers in the class. Such confirmatory discovery revealed different percentages of former and current customers than the parties were expecting, which forced the parties to exchange proposals amending the structure of the deal so as to ensure class members were treated fairly vis-a-vie each other.  Ultimately, after much further negotiation, the parties were able to reach agreement on a structure that would do just that.

62.    Over the next several weeks, the parties worked to finalize the specific terms of the agreement.  The parties exchanged multiple redlined drafts, which included fine tuning the allocation formula to ensure payments are fairly divided among class members in accordance with Plaintiffs' theories in a logistically feasible manner.  The parties also focused on how notice and eventually payments could most efficiently and fairly be disseminated to the class members.  The parties also exchanged multiple drafts of the notices to ensure that the settlement was accurately and appropriately described to the class.

63.    The parties did not negotiate the amount of fees and expenses or service awards to the class representatives which CardConnect would not oppose until after the substantive provisions of the settlement, including the amount of the direct relief to the class, was agreed upon.

64.    Consensus was reached on final drafts of the agreement, notices, and allocation formula in May 2020.

**C.    Facts Supporting the Settlement.**

65.    Based on the extensive class discovery taken in this matter, we believe Defendant's records contain the information points needed to determine which of their merchants meet the objective criteria for inclusion in the settlement class, such that the members of the settlement

class are readily ascertainable.

66.     Among other things, the settlement requires Defendant to pay up to $7.65 million in cash benefits to roughly 110,000 settlement class members, the costs of notice and administration, attorneys' fees and expenses, and incentive awards to the class representatives.

67.     Settlement class members who are current customers will automatically receive payments from the settlement and settlement class members who are former customers will receive a payment if they submit a simple claim form attesting that they are a class member and provide their current contact information.

68.     There is good reason to pay current customers automatically while compelling former customers to file a claim.  Current customers are active entities for which CardConnect maintains current address information.  Thus, a high percentage of the checks sent to such customers are likely to be cashed.  Former customers, meanwhile, may not be active entities and the address information possessed by CardConnect is often stale and outdated.  Thus, if checks were automatically sent to former customers, the cash rate would be extremely low and the risk of fraudulent deposits would be relatively high.  The claim process gives former customers an opportunity to provide updated address and payee information so as to ensure checks are routed to the correct location.

69.     The amount of each payment will vary depending on whether the class member is a current or former customer and how long they were a customer during the class period.  The allocation formula was negotiated and chosen to ensure that all settlement class members will be fairly compensated relative to each other.

70.     The parties agreed that, subject to the Court's approval, the class representatives should receive incentive awards of up to $15,000 each.  Incentive awards of that amount are justified

based on the significant time and effort expended by the owners and representatives of Plaintiffs, which included lengthy depositions and deposition preparation for one or more owners of each Plaintiff.

71.     This is a difficult case that involves voluminous account data, billions of transactions, and complicated issues of law.   Without the settlement, Plaintiffs would face substantial hurdles litigating their claims through class certification, summary judgment motions, *Daubert* challenges, trial, and appeals.

72.     We believe Plaintiffs and the settlement class could succeed on their claims at trial. However, the risks involved could not be disregarded.   For instance, there was a risk that the implied contract laws of all 50 states would be an issue, which Defendant has claimed present insurmountable manageability problems.   Predominance obstacles were also present given Defendant's allegations that each schedule of fees was individually negotiated and merchants often agreed to amend such fee schedules via telephone, on an individual basis.

73.     Assuming a class could be certified, Plaintiffs also risked losing on summary judgment, at trial, or on appeal (where Defendant would argue that the Court's ruling that signatures were required in order for its contract to take effect was legally erroneous).   The proposed settlement avoids these uncertainties and provides the settlement class with immediate, meaningful, and certain monetary and equitable relief.

74.     Under these circumstances, we and Plaintiffs appropriately determined that the benefits of the settlement and the risks of continued litigation warrant a resolution at the stage.

75.     Pursuant to the allocation formula, one-third of the net settlement fund is being distributed to current customer class members and two-thirds is being distributed to former customer class members.   Although this one-third/two-thirds split does not comport exactly with the true

breakdown of class members (44% current and 56% former), the current customer class members are also receiving important equitable relief that allows them more opportunity to terminate their contract with Defendant without being forced to pay an early termination fee whenever CardConnect provides notice of a new fee or fee increase. This practice change, which must remain in effect for at least three years, is extremely valuable to current customer class members given CardConnect's early termination fees are often up to $750 per merchant. This is a significant achievement for current customers that would rather take their processing business elsewhere than be subjected to new or increased fees.

76.     Based on our work with Mr. Jewell as well as our analysis of strengths of Defendant's defenses, we estimate the settlement recovers for class members approximately 29 percent of their most likely recoverable trial damages. Meanwhile, if CardConnect's class-wide damages estimate is considered, the settlement recovers approximately 35 percent of potential damages.

77.     Our firm has served as counsel in several putative class actions brought against payment processors that alleged overbilling. Two of these cases were lost on contract defenses that CardConnect would have asserted in this case (had the written contracts been deemed effective). *Cobra Tactical, Inc. v. Payment Alliance Int'l, Inc.*, 315 F. Supp. 3d 1342, 1350-51 (N.D. Ga. 2018) (dismissing amended complaint because merchants failed to provide timely notice of fee disputes); *Zam & Zam Super Market, LLC v. Ignite Payments, LLC*, 736 Fed. Appx. 274, 277-78 (2d Cir. 2018) (affirming similar dismissal order). Four other cases litigated by our firm, meanwhile, have been settled on favorable terms to the settlement classes. *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1354 (N.D. Ga. 2017) (approving $52 million class settlement); *Expert Auto Repair, LLC v. Payment Systems*, Los Angeles County Superior Court Case

16

No. BC623856 (Jan. 23, 2019) (approving $995,000 class settlement with practice changes); *Al's Pals Pet Care, LLC v. Woodforest National Bank*, S.D. Tex Case No. 4:17-cv-3852 (Jan. 30, 2019) (approving $15 million class settlement with practice changes); *Alghadeer Bakery & Market, LLC v. Worldpay US, Inc.*, N.D. Ga. Case No. 16-cv-3627-MLB (June 3, 2020) ($15 million class settlement with practice changes approved).  The negotiation of the terms of this settlement benefited from our experience in these prior cases.

78.    By any reasonable measure, this recovery is a significant achievement given the extraordinary obstacles that Plaintiffs and the settlement class faced in the litigation.

79.    We have discussed the settlement terms at length with the three named Plaintiffs and they all agree that the settlement is a fair, adequate, and reasonable compromise.

80.    Because one of Defendant's primary ways of communicating with their customers is by statement message, statement message notice has been incorporated into the notice program as the default notice mechanism for current customer class members.  The default notice mechanism for former customer class members is U.S. mail, with email notice filling in any gaps.

81.    Subject to the Court's approval, the parties have selected KCC Class Action Services LLC ("KCC") to serve as the settlement administrator after obtaining proposals from multiple administration firms.  KCC is a well-known administration firm that has successfully administrated many class action settlements, including a recent payment processing class settlement.  *See* KCC Experience Brochure (Exh. 2 hereto).  KCC's proposal was competitive with other proposals.

82.    There are no agreements between the parties other than the settlement agreement.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief.  Executed this 19th day of June, 2020, at Atlanta, Georgia.

_/s/ E. Adam Webb_
E. Adam Webb

_/s/ Matthew C. Klase_
Matthew C. Klase

EXHIBIT 1

# WEBB, KLASE & LEMOND, LLC

### ATTORNEYS AT LAW

1900 THE EXCHANGE, S.E.  ●  SUITE 480 ● ATLANTA, GEORGIA 30339

(770) 444-9325  ●  (770) 217-9950 (fax) ● www.WebbLLC.com

## FIRM RÉSUMÉ

Webb, Klase & Lemond, LLC is a law firm that concentrates its practice in the areas of complex litigation, including class actions, with a focus on wrongful deprivations by corporate and government entities.  Our mission at WK&L is to provide unsurpassed legal services to our clients.  We have been successful in achieving this lofty goal due primarily to the dedication of our attorneys and staff.  Our clients benefit because WK&L is not like most other law firms.  We are narrowly focused on those areas where our expertise sets us apart and our resourcefulness and creativity allow us to attack problems from new and different angles.

Expertise and Focus.  We do not accept all types of legal work.  We will take on clients only if our core competencies will allow us to provide excellent representation and value.  For example, we do not handle criminal cases, wills or trusts, family law, or real estate litigation. We maintain a narrow focus on those areas of law in which our lawyers possess a present expertise or, in rare cases, a total dedication to becoming the best.  We maintain the discipline and focus to continue to practice in those areas where we can provide a competitive advantage to our clients.

Resourcefulness and Creativity.  Lawyers, like all professionals, can become set in their ways.  Litigators often utilize arguments from previous cases without reevaluating the case to ensure that such arguments are the best possible given the situation.  At WK&L we are constantly reevaluating our litigation strategies to improve on our clients' opportunities for victory.  We endeavor to tailor each legal brief or oral argument to provide the greatest opportunity of success.  We are not content to perform merely competent legal services.

With attention to these ideals, Webb, Klase & Lemond has created tremendous value for its clients.  We will continue to do so in the years ahead.

## PARTNER BIOGRAPHIES

- E. Adam Webb, B.A. *cum laude* Harvard University (1993); J.D. *cum laude* University of Georgia School of Law (1996).  While in law school Mr. Webb was named an Editor of the *Georgia Law Review.*  He was a member of the Mock Trial Board and was selected for the Order of Barristers, an honor bestowed on the school's most outstanding oral advocates.   After graduation, Mr. Webb worked as a commercial litigator with one of the nation's foremost First Amendment law firms, Dow, Lohnes & Albertson, PLLC.  He represented numerous media entities, including newspapers, television and radio stations, and outdoor advertising companies. Mr. Webb is now the managing partner at Webb, Klase & Lemond and works as a litigator in the state and federal courts of Georgia and numerous other states.  He has been admitted to practice

before all Georgia trial and appellate courts, the District Courts for the Middle and Northern Districts of Georgia, Northern District of Illinois, and Eastern District of Wisconsin, the Circuit Courts of Appeal for the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits, and the United States Supreme Court.

- Matthew C. Klase, B.A. *cum laude* Florida State University (1999); J.D. The Ohio State University College of Law (2002). While in law school, Mr. Klase was extremely active in the trial practice group, specifically working in conjunction with the Franklin County Public Defender's Office toward the defense of indigent individuals. After law school, Mr. Klase practiced for several years at Gordon & Rees, LLP, a large commercial litigation firm headquartered in San Francisco, California. He is a seasoned litigator who focuses his practice on rectifying corporate and government malfeasance. Mr. Klase is admitted to practice before all the Georgia and California state trial and appellate courts, the District Courts of California and the Middle and Northern Districts of Georgia, and the Court of Appeals for the Ninth Circuit.

- G. Franklin Lemond, Jr., B.A. Furman University (1996); M.A. University of North Carolina at Charlotte (1998); J.D. Georgia State University College of Law (2004). While in law school, Mr. Lemond was selected to be a member of Georgia State's Moot Court team and received an Honors distinction in his Litigation Section. Prior to becoming a lawyer, Mr. Lemond worked as a Law Librarian at one of Atlanta's most prominent law firms, Alston & Bird, LLP. Mr. Lemond has been admitted to practice before all Georgia trial and appellate courts, the District Courts for the Middle and Northern Districts of Georgia, and the Eleventh Circuit Court of Appeal. Mr. Lemond was named a "Rising Star" by Georgia Super Lawyers Magazine from 2012 − 2014.

## NOTEWORTHY CLASS ACTION CASES

<u>Mercury Payments Litigation</u> (Northern District of Georgia) − Co-lead counsel in case challenging card processing fees. Class settlement reached resulting in common fund of $52 million. Order granting final approval to settlement available at: 275 F. Supp. 3d 1350 (N.D. Ga. 2017).

<u>Merchant's Choice Litigation</u> (Southern District of Texas) − Lead counsel in case challenging card processing fees. Class settlement reached resulting in common fund of $15 million. Final approval granted in 2018.

<u>i3 Verticals Litigation</u> (Los Angeles Superior Court, California) − Lead counsel in case challenging card processing fees. Class settlement reached resulting in monetary relief in excess of $1 million and substantial equitable relief. Final approval granted in 2018.

<u>In re Checking Account Overdraft Litigation</u> (MDL − Southern District of Florida) − Currently serve on Plaintiffs' Executive Committee. Leader or co-team leader against Wachovia Bank, PNC Bank, Compass Bank, M&T Bank, RBC Bank, Synovus Bank, and United Bank. Substantial work performed as to foundational issues to establish the Plaintiffs' strategy in the multidistrict litigation. Work on cases against nearly all other banks in the MDL, most notably J.P. Morgan Chase, US Bank, Citizens Bank, and TD Bank.

Favorable rulings on arbitration motions available at: <u>Garcia v. Wachovia Corp.</u>, 829 F. Supp. 2d 1316 (S.D. Fla. 2011), aff'd 699 F.3d 1273 (11th Cir. 2012); <u>Dasher v. RBC Bank (USA)</u>, 915 F. Supp. 2d 1334, aff'd 745 F.3d 1111 (11th Cir. 2014); <u>Johnson v. KeyBank, N.A.</u>, 2015 WL 464266 (S.D. Fla. Feb. 3, 2015).

Favorable rulings on motions to dismiss reported at: 694 F. Supp. 2d 1302 (S.D. Fla. 2010); 797 F. Supp. 2d 1312 (S.D. Fla. 2011); 883 F. Supp. 2d 1244 (S.D. Fla. 2012); 883 F. Supp. 2d 1251 (S.D. Fla. 2012); 2011 WL 1085451 (S.D. Fla. Mar. 21, 2011).

Favorable rulings on class certification reported at: <u>Larsen v. Union Bank, N.A.</u>, 275 F.R.D. 666 (S.D. Fla. 2011); <u>Mosser v. TD Bank, N.A.</u>, 281 F.R.D. 667 (S.D. Fla. 2012); <u>Simmons v. Comerica Bank</u>, 286 F.R.D. 645 (S.D. Fla. 2012); <u>Garcia v. Wachovia Bank, N.A.</u>, 307 F.R.D. 630 (S.D. Fla. 2015); <u>Gutierrez v. Wells Fargo Bank, N.A.</u>, 307 F.R.D. 656 (S.D. Fla. 2015).

Assisted in the procurement of settlements in excess of $1 ***billion***, including the following: (i) Bank of America − $410 million; (ii) Chase − $110 million; (iii) Citizens − $127 million; (iv) U.S. Bank − $55 million; (v) PNC Bank − $90 million; (vi) TD Bank − $62 million; (vii) Union Bank − $35 million.

<u>In re TD Bank, N.A. Debit Card Overdraft Fee Litigation</u> (MDL − District of South Carolina) − Serve as co-lead counsel. Defeated motion to dismiss with reported decision available at: 26 F. Supp. 3d 510 (D.S.C. 2014). Reported decision granting class certification available at: 325 F.R.D. 136 (D.S.C. 2018). Class settlement reached resulting in settlement valued at $70 million ($43 million cash and $27 million debt forgiveness). Preliminary approval granted in 2019. Final approval pending.

<u>Lunsford v. Woodforest Nat'l Bank, N.A.</u> (Northern District of Georgia) − Overdraft fee case resulting in a class-wide settlement worth $7.75 million. Reported decision denying bank's motion to dismiss and motion to strike class allegations available at: 299 F.R.D. 695 (N.D. Ga. 2013).

<u>Jenkins v. Trustmark Nat'l Bank</u> (Southern District of Mississippi) − Overdraft fee case resulting in class-wide settlement worth $4.0 million. Reported final approval decision available at: 300 F.R.D. 291 (S.D. Miss. 2014).

<u>Savannah Oaks v. Georgia Waste</u> (Fulton Superior Court, Georgia) − Case challenging waste fees imposed on commercial and industrial customers resulting in class-wide settlement worth $4.5 million. Final approval granted.

<u>Faris v. Flagstar Bank</u> (Oakland Circuit Court, Michigan) − Overdraft fee case against the largest Michigan bank resulting in class-wide settlement worth $7.7 million. Defeated motion to dismiss, pursued class discovery, obtained class certification, and was appointed lead class counsel.

<u>Glaske v. Independent Bank</u> (Wayne Circuit Court, Michigan) − Overdraft fee case resulting in class-wide settlement worth $2.215 million. Defeated motion to dismiss and obtained decision from the Michigan Court of Appeals affirming denial of dismissal: 2016 WL 298986 (Mich. Ct. App. Jan. 21, 2016).

Collier v. National Penn Bank (Philadelphia Court of Common Pleas) – Overdraft fee case resulting in class-wide settlement. Defeated motion to dismiss and motion to compel arbitration at trial court level. Obtained decision from Pennsylvania Superior Court affirming denial of motions (128 A.3d 307 (Pa. Super. 2015)) and Pennsylvania Supreme Court denied petition for leave to appeal: 138 A.3d 1 (Pa. 2016). Final approval granted.

Ratzlaff v. Bank of Oklahoma (Tulsa District Court, Oklahoma) – Overdraft fee case resulting in class-wide settlement worth $7.8 million. Defeated motion to dismiss and obtained decision from the Oklahoma Supreme Court denying certiorari. Final approval granted.

T.A.N. v. PNI Digital Media, Inc. (Southern District of Georgia) – Negotiated nationwide class settlement on behalf of customers of PNI Digital whose information was taken in a data breach. Final approval granted.

Schmitt v. Nationstar Mortgage, LLC (Gwinnett Superior Court, Georgia) – Negotiated class settlement on behalf of customers of Nationstar Mortgage for violating Georgia law. Final approval granted.

Bass v. Sierra Pacific Mortgage Co. (Gwinnett Superior Court, Georgia) – Negotiated class settlement on behalf of customers of Sierra Pacific Mortgage Company for violating Georgia law. Final approval granted.

Regan v. Stored Value Cards, Inc. (Northern District of Georgia) – Putative class action against prepaid debit card provider and bank related to the card's use fees. Motion to compel arbitration denied at: 2015 WL 570524 (N.D. Ga. Jan. 13, 2015). Denial of arbitration affirmed at: 608 Fed. Appx. 895 (11th Cir. June 18, 2015). Case settled.

Dickerson v. Wachovia Bank, N.A. (Fulton Superior Court, Georgia) – Putative class action challenging ATM practices. Wachovia's motion to dismiss denied. Case settled.

White v. Wachovia Bank, N.A. (Northern District of Georgia) – Putative class action challenging practices related to overdraft charges. Reported decision at: 563 F. Supp. 2d 1358 (N.D. Ga. 2008). Case settled.

Portfolio Recovery Associates Litigation (Middle District of Georgia) – Challenged practices by debt collection firm. Decision can be found at 2010 WL 2012149 (M.D. Ga. May 20, 2010). Case settled.

Swift Trucking Litigation (Western District of Tennessee) – Defeated a motion to dismiss in a putative class action challenging the testing practices of a commercial truck driving school. Reported decision found at: 694 F. Supp. 2d 947 (W.D. Tenn. 2010). Obtained order certifying class of over 8,700 former Swift students. Reported decision found at: 275 F.R.D. 475 (W.D. Tenn. 2011). Class settlement received final approval.

<u>Barkwell v. Sprint Communications Co., L.P.</u> (Middle District of Georgia) – Obtained class settlement on behalf of Sprint customers dealing with imposition of surcharges on customer accounts.  Order denying motion for summary judgment available at: 2010 WL 5069912 (M.D. Ga. Dec. 6, 2010).  Order denying motion to compel arbitration available at: 2012 WL 112545 (M.D. Ga. Jan. 12, 2012).  Final approval granted.

<u>Pounds v. Cobb EMC</u> (Cobb Superior Court, Georgia) – Co-counsel in derivative action.  Case was eventually resolved by settlement with total common benefit in excess of $50,000,000.

<u>City of Atlanta Watershed Management</u> (Fulton Superior Court, Georgia) – Lead counsel on behalf of numerous City of Atlanta residents in putative class action against the City involving overbilling by its Department of Watershed Management.  Obtained order enjoining the City from terminating water service during billing disputes and overcame motion to dismiss filed by the City.  Case settled for substantial injunctive relief, sweeping practice changes, and reimbursement of legal fees and costs.

<u>Cobb County Occupation Tax Litigation</u> (Cobb Superior Court, Georgia) – Obtained class certification order for Cobb County businesses which were assessed occupation taxes in amounts greater than allowed by law.  Class-wide settlement reached with County and approved by Court.

<u>Cobb County Licensing Fee Litigation</u> (Cobb Superior Court, Georgia) – Obtained class certification order for attorneys practicing in Cobb County who were assessed an occupation tax as a precondition of practicing law.  Class-wide settlement reached with County and approved by Court.

<u>Clark v. Aaron's, Inc.</u> (Northern District of Georgia) – Lessee of household furniture brought putative class action against lessor, alleging false advertising, breach of good faith and fair dealing, unjust enrichment, civil usury, unconscionability.  Order on motion to dismiss reported at: 914 F. Supp. 2d 1301 (N.D. Ga. 2012).  Case settled.

## NOTEWORTHY FIRST AMENDMENT DECISIONS

<u>Coffey v. Fayette County</u> (Georgia Supreme Court) – Represented resident who was issued citations for displaying political signs in his front yard.  Obtained three reversals from the Georgia Court of Appeals and Supreme Court.  Decisions published at: 610 S.E.2d 41 (Ga. 2005), 631 S.E.2d 703 (Ga. 2006), and 656 S.E.2d 262 (Ga. Ct. App. 2008).  Case settled.

<u>Tinsley Media, LLC v. Pickens County</u> (Eleventh Circuit Court of Appeals) – Obtained order reversing decision of district court and holding that sign ordinance was unconstitutional.  Decision available at: 2006 WL 2917561 (11th Cir. Oct. 12, 2006).  Case settled.

<u>KH Outdoor, LLC v. City of Trussville</u> (Eleventh Circuit Court of Appeals) – Invalidated unconstitutional ordinance and upheld damage and fee award.  Decisions published at: 458 F.3d 1261 and 465 F.3d 1256 (11th Cir. 2006).

The Lamar Company, LLC v. City of Marietta (Northern District of Georgia) – Obtained order invalidating an unconstitutional sign ordinance of the City of Marietta.  Decision available at: 538 F. Supp. 2d 1366 (N.D. Ga. 2008).  Case settled.

KH Outdoor, LLC v. Fulton County (Superior Court of Fulton County, Georgia) – Obtained order that invalidated a local government's denial of several sign permit applications and directed the applied-for signs to be built.  Summary judgment in client's favor affirmed at 711 S.E.2d 682 (Ga. 2011) (requiring issuance of multiple sign permits).  Obtained jury verdict of $1,250,000 and full reimbursement of all legal fees and costs.

KH Outdoor, LLC v. Fulton County (Northern District of Georgia) – Parallel litigation with state court action.  Obtained jury verdict of nearly $4,000,000 and full reimbursement of all legal fees and costs.  Case reversed with instructions by Eleventh Circuit and subsequently settled on favorable terms.

**Other Notable Decisions**: Nittany Outdoor Adver., LLC v. College Twp., 2014 WL 2094335 (M.D. Pa. May 20, 2014); Canton Partners v. Scarbrough Grp., Inc., 728 S.E.2d 733 (Ga. Ct. App. 2012); Roma Outdoor Creations, Inc. v. City of Cumming, 599 F. Supp. 2d 1332 (N.D. Ga. 2009); Advantage Media, LLC v. City of Hopkins, 408 F. Supp. 2d 780 (D. Minn. 2006); Tanner Adver. Group, LLC v. Fayette County, 451 F.3d 777 (11th Cir. 2006) (*en banc*); Covenant Media of Ill., LLC v. City of Des Plaines, 391 F. Supp. 2d 682, 689-94 (N.D. Ill. 2005); Covenant Media of Ill., LLC v. City of Des Plaines, 2005 WL 2277313 (N.D. Ill. Sept. 15, 2005); Lockridge v. Village of Alsip, 2005 WL 946880 (N.D. Ill. Apr. 18, 2005); Trinity Outdoor, LLC v. Oconee County, 2004 WL 5026733 (M.D. Ga. May 20, 2004); Prime Media, Inc. v. City of Franklin, 2004 WL 5026263 (M.D. Tenn. Nov. 8, 2004); Trinity Outdoor, LLC v. Oconee County, 2003 WL 25301942 (M.D. Ga. May 21, 2003); Horizon Outdoor, LLC v. City of Industry, 228 F. Supp. 2d 1113 (C.D. Cal. 2002); City of Roswell v. Eller Media Co., 275 Ga. 379 (2002).

# EXHIBIT 2



**KCC Class Action Services Resume**

KCC is an industry leader in class action settlement administration. We administer claims processes and distribute funds in a vast array of varying matters, ranging from small and simple settlements to multi-year complex settlements involving millions of claimants.

KCC's parent company, Computershare, is a $9 billion publicly-traded company which, among its many business lines, provides global financial services centering on communications with customers on behalf of our corporate clients. Computershare employs over 12,000 people and does business with more than 16,000 clients in more than 21 countries. KCC's operations are regulated by federal agencies, including both the SEC and OCC. KCC has the largest infrastructure in the class action industry, and is backed by superior data security, call center support and technology. In addition to the immense resources and capabilities brought to bear through Computershare, KCC can execute all operations in-house with zero outsourcing; a capacity which allows for full quality control over each aspect of service.

KCC has administered over 7,000 class action matters and handled thousands of distribution engagements in other contexts as well. Our call centers handle 13.9 million calls each year. Our domestic infrastructure can open and scan 200,000 claims in a single day, and we have document production capabilities that print and mail millions of documents annually. Last year, our disbursement services team distributed more than a trillion dollars.

**Locations**
KCC has an administrative office in El Segundo, CA, operation offices in San Rafael, CA, and Louisville, KY, and presence in the East Coast, South and Midwest. In addition to these offices, KCC has the global support of Computershare. In the United States Computershare has more than 20 offices.

**KCC Personnel**
KCC's experienced team of experts knows first-hand the intricacies contained in every aspect of settlement administration, and approach each matter with careful analysis and procedural integrity. Each client is assigned a team of experienced consultants, specialists and technology experts who serve as knowledgeable, reliable and accessible partners that have earned a reputation for exceeding clients' expectations. KCC's executive team – Gerry Mullins, President; Patrick Ivie, Senior Executive Vice President; and Daniel Burke, Executive Vice President – are experienced industry leaders.

Our personnel have considerable experience which includes years of practice with KCC and related endeavors. KCC's professionals have extensive training, both on-the-job and formal, such as undergraduate and advanced business, information technology and law degrees, and they possess and/or have had licenses and certificates in disciplines that are relevant to class action administration.

**Recognition**
Our settlement administration services have been recognized by *The National Law Journal*, *The New York Law Journal, The New Jersey Law Journal, The Recorder, Legal Intelligencer, Legal Times* and other leading publications. KCC has earned the trust and confidence of our clients with our track record as a highly-responsive partner.



| Settlement Value | |
|---|---|
| **Case** | **Value** |
| Fortis Settlement | $1,572,690,000 |
| Ramah Navajo Chapter v. Jewell | $940,000,000 |
| U.S.A. v. The Western Union Company | $586,000,000 |
| Vaccarino v. Midland National Life Ins. Co | $555,000,000 |
| Safeco v. AIG | $450,000,000 |
| Johnson v. Caremark Rx, LLC | $310,000,000 |
| In re Activision Blizzard, Inc. Stockholder Litigation | $275,000,000 |
| Harborview MBS | $275,000,000 |
| Dial Corp. v. News Corporation, et al. | $244,000,000 |
| In re Medical Capital Securities Litigation Settlement | $219,000,000 |
| In Re: NCAA Athletic Grant-In-Aid Antitrust Litigation | $208,664,445 |
| Gutierrez v. Wells Fargo Bank, N.A | $203,000,000 |
| Bell v. Farmers - Bell III | $170,000,000 |
| In Re Diamond Foods, Inc. Securities Litigation | $167,000,000 |
| In re JPMorgan Chase & Co. Securities Litigation | $150,000,000 |
| Haddock v. Nationwide Life Insurance Co. Settlement | $140,000,000 |
| In re Freeport-McMoran Copper & Gold Inc. Derivative Litigation Notice | $137,500,000 |
| Bank of America, et al. v. El Paso Natural Gas Company, et al. | $115,000,000 |
| In re Anthem, Inc. Data Breach Litigation | $115,000,000 |
| In re Medical Capital Securities Litigation Settlement | $114,000,000 |
| Drywall Acoustic Lathing v. SNC Lavalin | $110,000,000 |
| In re Automotive Parts Antitrust Litigation III | $103,000,000 |
| Rural/Metro Corporation Stockholders Litigation | $97,793,880 |
| J.C. Penney Securities Litigation | $97,500,000 |
| Smokeless Tobacco Cases | $96,000,000 |
| Oubre v. Louisiana Citizens | $92,865,000 |
| Ardon v. City of Los Angeles | $92,500,000 |
| Nishimura v. Gentry Homes, Ltd. II | $90,341,564 |
| In Re: Potash Antitrust Litigation (II) (Escrow) | $90,000,000 |
| Ormond, et al, v. Anthem, Inc. | $90,000,000 |
| In re DRAM Antitrust Litigation | $87,750,000 |
| In re: Morning Song Bird Food Litigation | $85,000,000 |
| Ideal v. Burlington Resources Oil & Gas Company LP | $85,000,000 |
| Willoughby v. DT Credit Corporation, et al. (Drivetime) | $78,000,000 |



| Class Members | |
|---|---|
| **Case** | **Volume** |
| Edwards v. National Milk Producers Federation et al. | 90,000,000 |
| In re Anthem, Inc. Data Breach Litigation | 80,000,000 |
| Carrier IQ Inc. Consumer Privacy Litigation | 47,300,000 |
| The Home Depot, Inc. Customer Data Security Breach Litigation | 40,000,000 |
| In Re Midland Credit Management, Inc. TCPA Litigation | 30,000,000 |
| Golden v. ContextLogic Inc. d/b/a Wish.com | 29,222,936 |
| Cassese v. WashingtonMutual | 23,200,344 |
| Rael v. The Children's Place, Inc. | 22,000,000 |
| In Re Optical Disk Drive Antitrust Litigation | 20,000,000 |
| In re UltraMist Sunscreen Litigation | 20,000,000 |
| Torres v. Wendy's International, LLC | 18,000,000 |
| In Re Lithium Ion Batteries Antitrust Litigation | 16,000,000 |
| Gordon v. Verizon Communications, Inc. | 15,236,046 |
| Experian Data Breach Litigation | 15,000,000 |
| Opperman v. Kong Technologies, Inc. et al. | 13,279,377 |
| Lerma v Schiff Nutrition International, Inc. | 12,000,000 |
| Kolinek v. Walgreen Co. | 10,213,348 |
| Dunstan v. comScore, Inc. | 10,000,000 |
| Sprint Government Restitution Program | 9,500,000 |
| Steinfeld v. Discover Financial Services | 9,088,000 |
| Cohen, et al. v. FedEx Office and Print Services, Inc., et al. | 9,000,000 |
| Elvey v. TD Ameritrade, Inc. | 8,639,226 |
| In Re: Monitronics International, Inc. Telephone Consumer Protection Act Litigation | 7,789,972 |
| In re Portfolio Recovery Associates Telephone Consumer Protection Act Litigation | 7,395,511 |
| Morrow v. Ascena Retail Group, Inc. and Ann Inc. | 7,277,056 |
| Shames v. The Hertz Corporation | 7,271,238 |
| In Re Facebook Biometric Information Privacy Litigation | 7,000,000 |
| Roberts, et al. v. Electrolux Home Products, Inc. | 6,305,000 |
| Chambers v. Whirlpool Corporation, et al. | 5,788,410 |
| Morales v. Conopco Inc. dba Unilever (TRESemmé Naturals) | 5,000,000 |