# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEH SHOU KAO and T S KAO, INC., on behalf of themselves and all others similarly situated,<br><br>      *Plaintiffs,*<br><br>  v.<br><br><br>CARDCONNECT CORP.,<br>      *Defendant.*<br>———————————————<br>TECH LOUNGE SP, LLC and<br>THE LAW OFFICE OF KEVIN ADAMS, PLLC, on<br>behalf of themselves and all others similarly situated,<br>      *Plaintiffs,*<br>  v.<br><br>CARDCONNECT CORP.,<br>      *Defendant.* | CONSOLIDATED<br>CIVIL ACTION<br>NO. 16-cv-5707 |

**PAPPERT, J.**                **February 23, 2021**

## <u>MEMORANDUM</u>

CardConnect Corporation provides merchant card processing services.  (ECF 14, ¶ 4.)  Teh Shou Kao, T.S. Kao, Inc., Tech Lounge SP, LLC and the Law Office of Kevin Adams, PLLC, on behalf of themselves and a putative class, sued CardConnect in separate cases, later consolidated, alleging CardConnect breached contractual obligations and was unjustly enriched by increasing and adding new, unspecified fees for its payment processing services in an automated and programmatic fashion.  (*See* ECF 14 ¶¶ 10-15; *see also* ECF 1 in Civ. A. No. 17-4014 (E.D. Pa.).)  The parties settled their claims and the Court granted Plaintiffs' unopposed preliminary approval motion

(ECF 113.)  After a telephonic final approval hearing[1] (ECF 120), upon review of a supplemental memorandum reviewing final claim statistics (ECF 123) and in the absence of objections to the settlement, the Court grants Plaintiffs' final approval motion (ECF 116) and their motion seeking attorneys' fees and an incentive award for the named Plaintiffs.  (ECF 117.)

I

A

CardConnect enrolls merchants in its card processing services after they sign a form contract with a fee schedule.  (ECF 14 at ¶¶ 27-28.)  Thereafter it processes merchants' card transactions and sends them monthly statements summarizing CardConnect's fees.  (*Id.* ¶¶ 49-53.)  Seeking to recover on behalf of a national class of merchants, T S Kao, Inc. d/b/a Lucky 7 Chinese Food and its owner Teh Shou Kao sued CardConnect challenging CardConnect's authority to collect the fees it billed.  (*See* ECF 14; *see also* ECF 1 in Civ. A. No. 17-4014 (E.D. Pa.).)  CardConnect filed a motion to dismiss (ECF 11), T S Kao and Te Shou Kao filed an Amended Complaint (ECF 14) and CardConnect filed an Answer.  (ECF 17.)  The parties commenced a first phase of discovery focusing on the named plaintiff's claims and exchanged multiple sets of written discovery and 15,000 pages of documents.  (Joint Decl. in Support of Preliminary Approval, ECF 112-3, ¶ 24-25.)  The parties also filed a joint Initial Stipulation of Facts.  (ECF 32.)

---

[1]     On November 25, 2020, citing the COVID-19 pandemic, the Chief Judge entered a Standing Order finding it "necessary and appropriate to temporarily reduce the level of on-site activity at courthouses . . . in this district . . . ."  November 25, 2020 Standing Order, available at http://www.paed.uscourts.gov/documents/standord/StandingOrder-Extension7.pdf (last checked January 12, 2020).  Accordingly, the Court determined that the final approval hearing would take place only via a telephone conference and, on December 16, 2020, entered an Order providing call-in information and directing the Settlement Administrator to make the information available to members of the settlement class by posting it on the settlement website.  (ECF No. 118.)

Tech Lounge SP, LLC and the Law office of Kevin Adams, PLLC filed a separate case asserting similar claims against CardConnect.  (ECF 1 in Civ. A. No. 17-4014 (E.D. Pa.).)  The cases were consolidated and, after briefing, the Court ruled that CardConnect and Plaintiffs never formed written contracts because CardConnect did not countersign the contracts.  Instead, the Court found the parties had entered into implied-in-fact contracts.  (*See* ECF 47; ECF 68; ECF 112-3, ¶¶ 33-35.)

The parties were unable to stipulate to the implied-in-fact contracts' terms and commenced a second discovery phase confined to the nature and scope of the contract terms.  (ECF 58.)  They exchanged further written discovery and 20,000 pages of additional documents and conducted eight depositions.  (ECF 112-3.)  Following another round of briefs, the Court ruled that absent a mutual modification, CardConnect was limited to charging the fees set forth in the service fee schedule provided to each Plaintiff and "[a]ll unsolicited and unilateral changes made in various billing statements that were not by mutual agreement [we]re not binding on the [P]laintiffs."  (ECF 69.)

CardConnect moved for reconsideration of the Court's Order or, in the alternative, certification for interlocutory review (ECF 71), Plaintiffs filed a response (ECF 72), and Card Connect filed a reply (ECF 73).  After filing their briefs, the parties agreed to participate in a settlement conference before Magistrate Judge Elizabeth Hey.  (ECF 112-3, ¶¶ 42-44.)  CardConnect produced voluminous data – over 20,000 pages – to Plaintiffs and their data expert, including lists of current and former customers, contracts, statements and raw data showing relevant fees paid by a sample of current and former CardConnect customers along with aggregate amounts of

relevant fees CardConnect earned during the class period.  (*Id.* ¶¶ 45-46.)  Plaintiffs'
expert reviewed CardConnect's data, prepared code allowing the extraction of potential
overcharges related to relevant fees and created demonstrative exhibits detailing his
findings.  (*Id.* ¶¶ 46-47.)  Plaintiffs produced the exhibits to CardConnect and Judge
Hey in advance of an unsuccessful June 10, 2019 settlement conference.  (*Id.* ¶ 46-48.)

On June 26, 2019, the Court denied CardConnect's motion for reconsideration or
certification for interlocutory appeal.  (ECF 98 & 99.)  The parties then commenced
class-certification discovery and exchanged additional written discovery and
documents.  (ECF 112-3, ¶¶ 51-53.)  Plaintiffs took four more CardConnect fact witness
depositions.  (*Id.* ¶¶ 51-55.)  The parties also exchanged expert reports and took expert
depositions.  (*Id.* ¶ 56.)  They agreed to participate in a March 13, 2020 mediation with
class-action mediator Rodney Max of Upchurch, Watson, White & Max.  (*Id.* ¶ 57.)
CardConnect provided additional class data prior to the mediation, including its own
expert analysis and class-wide damages estimate.  (*Id.*)  The parties exchanged
mediation statements briefing issues remaining in the case.  (*Id.*)

After a full day of arm's length negotiations where the parties raised their
"profound disagreement" on issues pertaining to the merits of Plaintiffs' claims and
class certification and used the mediator to bridge particularly challenging issues, the
parties reached and executed a memorandum of understanding for a class settlement.
(*Id.* at ¶ 59.)  Thereafter, CardConnect provided required confirmatory discovery
regarding the relative percentages of former and current customers in the class.  (*Id.* at
¶ 61.)  Because the confirmatory discovery revealed results neither side expected, the
parties engaged in several weeks of additional negotiations to reach a settlement that

ensured class members were fairly treated relative to each other.  (*Id.*)  The parties then engaged in an adversarial exchange of multiple redlined drafts of a written agreement, ultimately resulting in the settlement agreement.  (*Id.* at ¶ 62-64; *see also* Settlement, ECF 112-2.)  Plaintiffs and class counsel moved for preliminary approval of the settlement and notice to the class and preliminary certification of a settlement class.  (ECF 112.)  The Court granted their preliminary approval motion on July 7, 2020 and directed notice of the proposed settlement to the settlement class.  (ECF 113.)

B

The settlement class is an opt-out class under Federal Rule of Civil Procedure 23(b)(3).  It includes "[a]ll CardConnect Merchants that paid at least one of the Subject Fees from November 1, 2012 through the date of Preliminary Approval."  (ECF 112-2, ¶ 3.1.)  "CardConnect Merchants" are those merchants that became customers by signing an agreement for processing services with CardConnect that is governed by Pennsylvania law.  (*Id.* ¶ 2.2.)  The "Subject Fees" are identified in Paragraph 2.28 of the Settlement.  The settlement class excludes several types of entities from the class, including entities owned by or affiliated with CardConnect.  (*Id.*)  The settlement class has 110,875 members, including 43,837 members that are current CardConnect customers.  (Final Approval Mem., ECF 116-1 at 5.)

CardConnect will pay up to $7.65 million to the class, including cash benefits via checks, incentive awards to the class representatives, notice and administration costs and legal fees and expenses.  (ECF 112-2, ¶ 9.1.)  All settlement class members are eligible to receive a cash payment.  43,837 current CardConnect customers will receive their payments automatically via check.  (*Id.* ¶ 9.2.1; ECF 116-1 at 5.)  67,038 former

5

customers were eligible to receive a payment via check upon completion of a claim form requiring them to provide current contact information and attest that they contracted with CardConnect during the class period.  (ECF 112-2, ¶ 9.2.3; ECF 116-1 at 5; *see also* Claim Form, ECF 112-2, Ex. A.)  One-third of the net settlement benefit (the amount remaining after payment of all other obligations) is allocated to current customers.  The other two-thirds is allocated to former customers.  (ECF 112.2, ¶¶ 9.2.1, 9.2.3.)  The amount available to each group is divided as follows:  thirty-five percent is equally allocated on a *per capita* basis to each member and sixty-five percent is allocated to members *pro rata* based on the total number of calendar months that a member was a CardConnect customer during the class period.  (*Id.*)  The formula is intended to fairly compensate class members relative to each other.

In addition to monetary relief, the settlement also requires a change in practices. CardConnect will amend the terms and conditions governing its merchant agreement to provide current customers fifty days after receiving notice of a CardConnect-initiated fee increase or new fee to terminate their accounts without payment of an early termination fee.  (*Id.* ¶ 9.2.2.)  This new term must remain in place for at least three years and could result in a potential $750 savings for any merchant who chooses to cancel an account instead of paying increased or new fees.  (ECF 112-3, ¶ 75.)

 In exchange for the benefits of the settlement, the settlement class will release CardConnect and

> each of its present and former parents (including First Data and Fiserv), subsidiaries, predecessors-in-interest or title, successors-in-interest or title, affiliates, members, limited and general partners, shareholders, directors, officers, employees, current and former employees, and each of their past or present officers, principals, executives, members, managers, agents, attorneys, and representatives ("Released Parties") from any and

all liabilities, rights, claims, demands, actions, suits, causes of action, damages, costs, attorneys' fees, losses, and remedies that have or could have been brought, alleged, or asserted, are currently pending or were pending, whether known or unknown, suspected or unsuspected, asserted or unasserted, existing or potential, liquidated or unliquidated, under or pursuant to any statute, regulation, common law, or equity, that result from, arise out of, are based upon, or relate in any way, directly or indirectly, to: (a) the allegations in the Action, (b) the defense of the Action; (c) all facts which relate to or arise from the Subject Fees or the Action; (d) the acquisition or receipt of payment card processing services; (e) the assessment of any fees or charges for the processing of credit or debit cards; and (f) any fees or charges imposed by CardConnect or any of its affiliates, from the beginning of the Class Period through Preliminary Approval.

(*Id.* ¶ 10.1; *see also id.* ¶ 10.2-10.11.)  Settlement class members retain the right to challenge invoices CardConnect sent following preliminary approval of the settlement. (*Id.*)

C

To provide notice to settlement class members, CardConnect forwarded names and contact information for all 110,875 members of the settlement class to the settlement administrator.  (*See* Neylon Decl., ECF 116-3, ¶ 8.)  41,426 current customers had valid email addresses and received notice of the settlement by email. (*Id.* ¶ 8, 17.)  2,411 current customers without a valid email address received notice by mail.  (*Id.* ¶ 18.)  67,038 former customers received mailed postcard notice of the settlement with claim forms attached.  (*Id.* ¶ 11.)  The settlement administrator made substantial efforts to update all addresses.  (*See id.* ¶¶ 9-10, 12-16.)  Settlement class members have had access to a toll-free number for information about the settlement. (*Id.* ¶ 26.)  In addition, on October 2, 2020, a long form notice, relevant pleadings and other information about the settlement were made available on a settlement website (www.cardconnectsettlement.com) where former customers could submit claim forms.

(*Id.* ¶ 24.)

As of December 23, 2020, the settlement website had 3,079 visits and the toll-free number fielded 211 calls. (Supplemental Neylon Decl., ECF 119, ¶ 5-6.) Notice of the settlement had a 97.5% deliverable rate to former customer class members and, for notice provided via the settlement administrator, a 97.3% deliverable rate to current customers. (*Id.* ¶¶ 7- 8.) CardConnect also separately sent individual notice to an additional 35,327 current customers in the settlement class. (*Id.* ¶ 8.)

At the time of the final approval hearing, only 1,380 of the individual notices the claims administrator sent to the 67,038 former customer class members were known to be undelivered. (*Id.*, ¶ 7.) However, as of December 21, 2020, the claims administrator had received only 2,725 timely-filed former customer claims via mail or the settlement website: claims from approximately 4.06% of former customer class members. (*Id.* ¶ 4.) The original postmark deadline for their claims was February 2, 2021. (*Id.*) At the final approval hearing, the Court asked whether COVID-19 had any impact on the notice process. To account for COVID-19 related postal service delays, after the hearing, the parties entered into a Stipulation and Order extending the claim deadline for former class members from February 2, 2021 to February 19, 2021. (ECF 122.) The Settlement Administrator notified the class of the extended deadline by posting information about the new deadline near the top of the settlement website. (ECF 123, ¶ 1.) By February 19, 2021, the settlement administrator had received 2,894 former customer claims, "meaning approximately 4.32% of the former customer class members timely filed a claim and will receive a payment from the settlement. (*Id.* ¶ 2.)

Any objections to the settlement were required to be postmarked by December 4, 2020. As of December 23, 2020, the settlement administrator had received no objections or requests for exclusion from the settlement. (ECF 119, ¶ 3).

## II

Federal Rule of Civil Procedure 23(e) requires court approval of class action settlements. Fed. R. Civ. P. 23(e)(2). Approval is appropriate "only after a hearing and on finding that it is fair, reasonable, and adequate." *Id.* The Court must (1) determine if the requirements for class certification under Rule 23(a) and (b) are satisfied; (2) assess whether notice to the proposed class was adequate; and (3) evaluate if the proposed settlement is fair under Rule 23(e). *See In re Nat'l Football League Players Concussion Injury Litig.*, 775 F.3d 570, 581 (3d Cir. 2014).

### A

The settlement class must meet Rule 23(a)'s requirements: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" and "effectively limit[s] the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citation omitted).

Because the numerosity requirement is generally met if the potential number of plaintiffs exceeds 40, the 110,875 Rule 23 settlement class members are sufficiently numerous under Rule 23(a). *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001).

The commonality bar "is not a high one." *Rodriguez v. National City Bank*, 726

F.3d 372, 382 (3d Cir. 2013).  A single common issue is enough to satisfy the commonality requirement.  *See Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Typicality requires the Court to assess "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentee's interests will be fairly represented." *Id.* at 57.  Both the commonality and typicality requirements are met. CardConnect provided card processing services to all settlement class members and they challenge CardConnect's authority to impose certain fees they were required to pay.

The final factor – whether "the representative parties will fairly and adequately protect the interests of the class" – is also met.  Fed. R. Civ. P. 23(a)(4).  On the record before the Court, the named Plaintiffs' interests are not antagonistic to those of other settlement class members and class counsel are qualified, experienced and capable of litigating the class's claims.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

B

The settlement class also "must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart*, 564 U.S. at 345.  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 594 (1997).  "[T]the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  *In re Processed Egg Products Antitrust Litig.*, 284 F.R.D. 249, 263 (E.D. Pa. 2012) (citing *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).  The predominance requirement is met where there are issues of law and fact common to all class members regarding CardConnect's billing practices and implied contracts.

Superiority requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *In re Warfarin Sodium*, 391 F.3d at 534 (citation omitted).  Rule 23(b)(3) directs the Court to consider the following factors:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum . . . .[2]

Fed. R. Civ. P. 23(b)(3).  All these factors are satisfied.  There are no evident interests favoring individual control.  Absent class certification, potential class members would lack an incentive to pursue their individual claims due to the size of their individual damages claims.

Because all the relevant Rule 23(a) and (b) factors are met, the settlement class is certified for purposes of settlement approval.

---

[2]     In the class action settlement context, the Court "need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.

C

"A court must determine that notice was appropriate before evaluating the merits of the settlement itself." *In re Am. Investors Life Ins. Co.*, 263 F.R.D. at 237 (citation omitted). Notice must be given to potential class members by the best notice practicable under the circumstances for all classes certified under Rule 23(b)(3). Fed. R. Civ. P. 23(c)(2)(B).

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.* The settlement administrator emailed and mailed Court-approved notice forms including the required information to settlement class members as described above, provided information about the settlement on the settlement website and ensured that returned notices were re-mailed as needed and to the extent possible. (ECF 116-3 at ¶¶ 12-16; 19-22.) Plaintiffs have complied with Rule 23's notice provisions.

D

"[A] class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.'" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 282, 316 (3d Cir. 1998) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)); *see also* Fed. R. Civ. P. 23(e). Rule 23(e)(2) directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C)

12

the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.[3]

Fed. R. Civ. P. 23(e)(2). "The purpose of Rule 23(e) is to protect the unnamed members of the class." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("Under Rule 23(e), trial judges bear the important responsibility of protecting absent class members, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims.") (citation omitted).

i

Class counsel and the named plaintiffs adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). Class counsel were able to "develop enough information about the [litigation] to appreciate sufficiently the value of the claims." *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016). They conducted a factual investigation before filing the complaints, obtained substantial discovery on the merits and on class certification. They briefed various legal issues before the Court and during the mediation process and retained a data expert to estimate class damages. (*See* ECF 112-3, ¶¶ 6-64.)

---

[3]    These factors are like the *Girsh* factors previously applied to decide whether a class action settlement is fair and reasonable in the Third Circuit. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975.); *see also Hall v. Accolade, Inc.*, No. 17-3423, 2019 WL 3996621, at *2 n.1 (E.D. Pa. Aug. 23, 2019) ("The *Girsh* factors predate the recent revisions to Rule 23, which now explicitly identifies the factors that courts should apply in scrutinizing proposed class settlements, and the discussion in *Girsh* substantially overlaps with the factors identified in Rule 23.")

ii

The settlement agreement was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(B). It is the product of extensive negotiations with experienced counsel on both sides. Settlement negotiations included an unsuccessful conference with Judge Hey with substantial preparations, including discovery and data analysis, and an in-person mediation session with a respected class-action mediator. "[T]he participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties." *Bellum v. Law Offs. of Frederic I. Weinberg & Assocs., P.C.*, No. 15-2460, 2016 WL 4766079, at *6 (E.D. Pa. Sept. 3. 2016).

iii

The relief the settlement is expected to provide to settlement class members is adequate when balanced against the cost and risk involved in pursuing a litigated outcome. Fed. R. Civ. P. 23(e)(2)(C)(i). Had an agreement not been reached, the parties would have been required to brief class certification, likely dispositive motions and challenges to expert testimony and a possible trial. For purposes of class certification Plaintiffs' claims raise predominance questions given Defendants' allegations that each customer's fee schedule is individually negotiated and that merchants often agree to amend fee schedules via individual telephone calls. (*See* Final Approval Mem. at 13.) Also, absent a settlement, there was a risk that the Court would accept CardConnect's argument that the implied contract laws of all fifty states would apply to Plaintiffs' claims, posing insurmountable class manageability problems. (*Id.*) There is no guarantee the Court would have certified a litigation class. CardConnect also has

merits defenses (including the voluntary payment doctrine) it would raise on summary judgment or at trial and, if there were an appeal, it would argue "that the Court's ruling that signatures were required in order for its contract to take effect was legally erroneous." (*Id.* at 13-14.) Compared to the costs and risks of continued litigation, the settlement avoids these uncertainties and provides the settlement class with substantial and certain relief. $7.65 million represents approximately twenty-nine percent of Plaintiff's estimate as to the class's recoverable damages at trial and thirty-five percent of CardConnect's damages estimate. (*Id.* at 14.) CardConnect will also provide current customers more time to terminate their agreements without payment of an early termination fee in the event of future fee increases.

The settlement agreement also establishes an effective method of distributing relief to the settlement class. Fed. R. Civ. P. 23(e)(C)(ii). In considering this factor, the Court "scrutinize[s] the method of [notice] processing" and "should be alert to whether the . . . process is unduly demanding." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018.) Current CardConnect customers in the settlement class will be mailed settlement checks automatically, while former customers who are settlement class members class needed only to complete and return a claim form with an updated address to get their checks. No other documentation was required and claim forms could be returned via mail, postage prepaid, or online by clicking on a link in the email notice or via the settlement website. (ECF 112-2, ¶¶ 9.6.1-9.6.2.) Although the former customer claim rate – approximately 4.32% of former customers – is not optimal, it is

not inconsistent with the average claims rate in class settlements.[4]  *See, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (citing evidence that claims rates in class settlements "rarely" exceed seven percent, "even with the most extensive notice campaigns").  The claims process is fair and reasonable and not unduly demanding.

No one has objected to the proposed award of attorneys' fees and costs after receiving notice of the request and the amounts requested in the notice distributed to the class.  As is further set forth below, it is reasonable.  Fed. R. Civ. P. 23(e)(2)(C)(iii).

Rule 23(e)(3) requires settling parties to "file a statement identifying any agreement made in connection with the proposal."  The settlement agreement is the only agreement in play in this litigation, and Plaintiffs have satisfied this requirement. (ECF 116-1 at 15.)

iv

The settlement agreement also treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(D).  All settlement class members are eligible to receive payments.  56% of them are former customers and two-thirds of the net settlement amount was available to them.  (*Id.*)  44% of the settlement class members are current customers and one-third of the net settlement amount will be distributed to them. (ECF 116-1 at 16.)  Current customers also receive the benefit of the practice change required by the settlement, the extended opportunity to terminate service without paying an early termination fee, a right not afforded to former customers.  (*Id.*)

In addition, the absence of any objections to the settlement (ECF 119, ¶ 3) suggests it is fair and reasonable.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 234-35

---

[4]     The low former customer claims rate might be explained by the possibility that some former customers – largely small businesses – did not receive the notice and claim form because they have closed (perhaps due to the pandemic) or changed locations without updating their addresses with the National Change of Address Database.  (*See* ECF 123 at ¶ 6.)

(3d Cir. 2001) (finding that a low number of objectors and opt-outs strongly favors approval of the settlement).

Because the necessary Rule 23 factors are met, the Court grants final approval of the settlement.

III

Defendants have, subject to court approval, agreed to pay $2.55 million in attorneys' fees – one-third of the $7.65 million available to settle the class members' claims – and $84,963.23 in litigation expenses.  (ECF 117-1 at 1.)  "In a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Two calculation methods may be used to determine whether a requested fee award is reasonable:  lodestar and percentage-of-recovery.  *See In re Gen Motors*, 55 F.3d at 820-21.  The lodestar method "uses the number of hours reasonably expended" to determine "an adequate fee irrespective of the monetary value of the final relief achieved for the class." *Id.* at 821.  The percentage of recovery method "calculates the percentage of the total recovery that the proposal would allocate to attorney[']s fees by dividing the amount of the requested fee by the total amount paid out by the defendant[.]"  *In re Cendant*, 264 F.3d at 256.  The percentage of recovery method is appropriate where, as here, the value of the settlement to the class can be readily calculated.  *See, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).

A

Factors to consider when determining whether an attorneys' fee award is appropriate using the percentage-of-recovery method include:  (1) the size of the fund

and the number of persons who will benefit; (2) the presence or absence of objections to the settlement terms and/or fees requested; (3) the skill and efficiency of the attorneys involved; (4) the complexity of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted by counsel; and (7) awards in similar cases. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest." *Id.* District courts must "engage in robust assessments of the fee award reasonableness factors when evaluating a fee request." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005). Applied here, the factors weigh in favor of granting class counsel's requested fee.

Plaintiffs negotiated a settlement that created a fund with a sizable value— worth up to $7.65 million—that has the potential to benefit an estimated 110,875 settlement class members. In calculating a percentage of recovery fee award, the Supreme Court has recognized "that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole," even if part of the fund reverts to the defendant. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Although some settlement class members may not file claims and receive compensation, "[t]heir right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel." *Id.* at 480. When attorneys' fees are calculated based on the entire fund, a court "requir[es] every member of the class to share attorney's fees to the same extent that he can share the recovery." *Id.* It is only appropriate to decrease the fee

award "[w]here a district court has reason to believe that counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class." *In re Baby Prod. Antitrust Litig.,* 708 F.3d 163, 178 (3d Cir. 2013).  As the Third Circuit explained,

> [t]here are a variety of reasons that settlement funds may remain even after an exhaustive claims process – including if the class members' individual damages are simply too small to motivate them to submit claims.  Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of representation they provided.  Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.

*Id.*

Here, 43,837 current customers will receive an automatic payment and the benefit of the agreed-upon early-termination fee practice change.  The remainder of eligible settlement class members – former customers – were mailed postcard notice of the settlement and where postcards were returned, emails were sent with links to the settlement website.  (ECF 116-3, ¶¶ 11-16.)  As of December 23, 2020, only 1,380 of 67,038 notices sent to former customers were known to be undelivered.  (ECF 119, ¶ 7.)  The claim form required for former customers to obtain settlement compensation was simple and only required current contact information and attestation that former customers were members of the settlement class.  (*See* 112-3, ¶ 67; 116-3, Ex. C, Ex. F.)  Class counsel adequately prioritized the benefit to the settlement class by negotiating a settlement that provides benefits to many individuals who would most likely have received no benefit otherwise.  The settlement confers a significant benefit considering the size of the settlement class and class counsel's fee award is appropriately calculated based on the size of the entire fund.  The first factor favors approval.

The second factor favors approval because no one objected to the fee request after dissemination of the Court-approved notices, which advised settlement class members that the Court would be asked to consider whether the lawyers for the class should be paid "up to one-third of the $7.65 million settlement amount" and reimbursed for their expenses. (*See* ECF 116-3, Ex. C, Ex. D, Ex. E at 5, Ex. F.) Likewise, no objections to the fee were raised at the telephonic final approval hearing.

The third factor also favors approval. The attorneys who negotiated the settlement agreement have substantial experience in class action and collective action litigation and have demonstrated their skill to the Court's satisfaction.

The fourth factor – the complexity and duration of the litigation – weighs in favor of the requested fee award. This litigation commenced in November 2016. (ECF 1.) The parties have since engaged in three discovery phases including expert discovery and mediation discovery and three rounds of substantive briefing. (ECF 117-1 at 14.) The litigation involves complex questions including whether a claim centered on the breach of an implied contract can be certified. (*Id.*) But for the settlement, litigation of the case's remaining issues would require substantial further motion practice prior to any trial.

The fifth factor – risk of nonpayment – also supports the requested fee award. Class counsel undertook representation of Plaintiffs on a contingency fee basis and advanced the costs of litigation. Had they not achieved a recovery, they would have received no compensation for their efforts. *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 309 (E.D. Pa. 2003). ("Any contingency fee [arrangement] includes a risk of no payment.") Plaintiffs' challenge to the validity of CardConnect's form contract for

lack of signatures was not guaranteed to succeed. *See, e.g. Cobra Tactical, Inc. v. Payment Alliance Int'l, Inc.*, 315 F. Supp. 3d 1342, 1350-51 (N.D. Ga. 2018) (dismissing breach claim on grounds merchant did not provide timely notice of challenged fee in accordance with contract). Nor was class certification guaranteed given CardConnect's arguments that the implied-in-fact contracts were governed by multiple state laws and had varying terms. (ECF 117-1 at 15.)

The amount of time spent by counsel, the sixth factor, also supports approval. Before filing their final approval briefs, class counsel had spent more than 2,200 hours on this litigation. (ECF 117-1 at 16.) Their work included pre-suit investigation, communications with the named Plaintiffs, preparing complaints, drafting motions and mediation briefs, three sets of written discovery and the review of over 55,000 pages of documents, taking or defending fourteen depositions, exchanging mediation damages discovery, working with an expert to analyze customer billing data, settlement negotiations, drafting the settlement agreement and preliminary and final approval papers, working with the settlement administrator on class notice, and communicating with settlement class members. (*Id.*) Their time was reasonably spent and weighs in favor of the requested fee award.

The fees requested here – one-third of the available settlement amount– is in line with fee awards in similar cases, supporting approval of the requested fee award. (Fee Mem. at 23-24.) In common fund cases, fee awards generally range from 19% to 45% of the settlement fund. *See In re Cendant*, 243 F.3d at 736 (citation omitted); *see also Galt v. Eagleville Hosp.*, 310 F. Supp. 3d 483, 498 (E.D. Pa. 2018) ("fee awards ranging from 30% to 43% have been awarded in cases with funds ranging from

$400,000 to $6.5 million"). In addition, the settlement provides unique relief to current customers, ensuring they have additional time to terminate their agreements with CardConnect in the event of future fee increases without payment of an early termination fee.

B

The Third Circuit has "suggested that district courts cross-check the percentage award at which they arrive against the 'lodestar' award method." *Gunter*, 223 F.3d at 195 n.1. But a lodestar cross-check is "not necessarily determinative." *In re Baby Prod.,* 708 F.3d at 179-80; *see also Moore v. GMAC Mortg.,* No. 07-4296, 2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) ("The lodestar cross-check is 'suggested,' but not mandatory."). The Court's mandate is simply to "determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interest of the entire class." *In re Baby Prod.,* 708 F.3d at 179.

A lodestar award "is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys" *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 216 (E.D. Pa. 2011) (internal quotation omitted). "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid*, 396 F.3d at 306-07 (footnote omitted) (citing *In re Prudential*, 148 F.3d at 342).

Estimated fees through completion of this litigation for counsel and local counsel calculated under the lodestar method in this case total $1,506,200. (ECF 116-5, ¶ 23-24.) Class counsel's declaration breaks down 2,529.6 total hours spent on this litigation by six attorneys and various paralegals. The attorneys' billable rates ranged from $395 to $850 per hour and paralegals billed at a rate of $150 per hour. (*Id.* ¶ 26.) The lodestar multiplier – calculated by dividing the requested fee ($2.55 million) by the lodestar figure ($1,506,200) – is 1.69.

The Third Circuit has recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential*, 148 F.3d at 341; *see also Acevedo v. Brightview Landscapes, LLC*, No. 13-2529, 2017 WL 4354809, at *20 (M.D. Pa. Oct. 2, 2017) (approving a 31.6667 percent percentage-of-recovery rate for attorneys' fees where the lodestar multiplier was 1.3). Given the facts of this case and the absence of objections to the requested fees, a lodestar multiplier of 1.69 is acceptable and does not require the Court to reduce the requested fees.

## IV

The requested $15,000 incentive payment to each of the three settlement class representatives is reasonable. Approving contribution or incentive awards to class representatives is routine. *See Sullivan*, 667 F.3d at 333 n.65. Absent the class representatives' participation, there would have been no case, and settlement class members would have had to pursue their claims alone. "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of

23

contributing to the enforcement of mandatory laws." *Id.* The Court awards the requested incentive payment.

An appropriate Order follows.

BY THE COURT:


 */s/ Gerald J. Pappert*            
GERALD J. PAPPERT, J.